GEORGE C. McGEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7787–70.    Filed November 20, 1973.

*S. Louis Greenberg*, for the petitioner.
*W. Read Smith*, for the respondent.

DRENNEN, *Judge:* Respondent determined the following deficiencies in and additions to petitioner's Federal income tax:

| Year | Deficiency | Addition under sec. 6653(b) |
| --- | --- | --- |
| 1957 | $9, 572. 28 | $4, 786. 14 |
| 1958 | 6, 411. 55 | 3, 205. 78 |
| 1959 | 5, 274. 36 | 2, 637. 18 |
| 1960 | 6, 285. 14 | 3, 142. 57 |
| 1961 | 4, 518. 26 | 2, 259. 13 |
| 1962 | 2, 394. 42 | 1, 197. 21 |
| 1963 | 1, 058. 03 | 529. 01 |

Petitioner admits that he received amounts of money from the source mentioned below in each of the years 1957–63 which he did not report on his tax returns for those years. Respondent concedes that the notice of deficiency was mailed after expiration of the statutory limitations period for all years except 1963. The issues are whether the unreported amounts received by petitioner were taxable income; if so,

whether petitioner's failure to include those amounts in his returns for 1957–63 and his failure to pay tax thereon was due to fraud so as to require imposition of the 50-percent additions to tax under section 6653(b), I.R.C. 1954, and whether petitioner's returns for each of those years were fraudulent with intent to evade tax so as to lift the bar of the statute of limitations for the years 1957–62 under section 6501(c)(1). There is also an issue as to the amount of cash petitioner received in 1957 and 1958.

FINDINGS OF FACT

The stipulated facts are incorporated herein by this reference.

George C. McGee, petitioner, was a resident of Groves, Tex., at the time of the filing of the petition herein. For the taxable years 1957 through 1963, petitioner filed individual income tax returns with the district director of internal revenue, Austin, Tex.

In each of the above taxable years, petitioner was employed by Gulf Oil Corp. (Gulf) as its port engineer in Port Arthur, Tex. Petitioner's general duty was to oversee the performance of maintenance and repairs on ships, tankers, barges, and other of Gulf's marine vessels in the Gulf Coast area. Petitioner thus inspected incoming and outgoing vessels, determined what work, if any, was necessary, arranged to employ marine contractors and service establishments, and supervised and directed repair operations. Within the scope of his employment, petitioner received, examined, and approved for payment invoices rendered by contractors and service establishments. Petitioner would initial invoices he approved and deliver them to Gulf for payment. Gulf would issue checks payable directly to the contractors and service establishments, but would deliver the checks to petitioner for transmittal to the payees.

Two marine contractors hired by petitioner in the taxable years 1957 through 1963 were Port Arthur Marine Engineering Works (PAMEW) and Gulf Copper & Manufacturing Co. (GCMC).

Petitioner obtained payments from PAMEW and GCMC as a condition to each firm's doing business with Gulf.

Payments from PAMEW originated with invoices submitted by that firm which contained either in whole or in part charges for services not actually performed. Such invoices were made at petitioner's request, typed on PAMEW invoice forms by PAMEW personnel, initialed by petitioner to indicate his approval for payment by Gulf, and taken by petitioner to Gulf for payment. Gulf never rejected or refused to pay such invoices, but always prepared checks payable to PAMEW. Petitioner would then either personally deliver Gulf's checks to PAMEW or, after notifying the latter, mail the checks to it.

PAMEW would deposit the checks in its general bank account and pay to petitioner a previously arranged portion of each remittance; petitioner's share varied from 5 to 50 percent.

Payments to petitioner were made in five ways: (1) In cash, given to petitioner in the office of PAMEW's president; (2) by check drawn on PAMEW payable to petitioner and endorsed by him; (3) by check drawn on PAMEW payable to petitioner and endorsed for deposit in petitioner's bank account by PAMEW's president; (4) by check drawn on PAMEW payable to PAMEW's president but endorsed payable to petitioner; and (5) by check payable to PAMEW's president, but endorsed for deposit to petitioner's bank account. One check payable to petitioner and two checks payable to the president of PAMEW but endorsed to petitioner totaling $2,455.86 were endorsed by an Alice Willingham as well as by petitioner.

In the taxable years at issue, petitioner received the following amounts by checks drawn on the bank account of PAMEW, which petitioner did not report on his income tax returns for those years:

| Taxable year | Receipts | Taxable year | Receipts |
|---|---|---|---|
| 1957 | $10,511.41 | 1961 | $6,898.61 |
| 1958 | 6,807.91 | 1962 | 2,784.00 |
| 1959 | 6,917.77 | 1963 | 2,800.00 |
| 1960 | 7,287.59 | | |

In the taxable year 1957 petitioner received cash in at least the amount of $2,183.61, and in 1958 in at least the amount of $1,191.72, from PAMEW, which petitioner did not report on his income tax returns for those years.

On November 27, 1963, Gulf filed a complaint in the U.S. District Court for the Eastern District of Texas, seeking recovery of funds which, Gulf alleged, *inter alia*, petitioner had obtained from it by fraud and breach of fiduciary duty. Petitioner filed an answer denying liability; however, the action ultimately was settled, petitioner agreeing to pay Gulf $70,000.

During the taxable years 1957 through 1963, GCMC paid sums to petitioner which it reported on Treasury Forms 1099 and which petitioner reported on his income tax returns for those years. GCMC did not receive any of the sums paid petitioner from false or padded invoices to Gulf, but from work it actually performed for Gulf.

In the course of an audit of his returns in 1965 petitioner denied to the investigating revenue agent that he had received any funds from PAMEW that he had not reported on his returns for the years here involved. During the years here involved petitioner had a checking account in a bank in Port Arthur, Tex. Respondent made an extensive

but unfruitful search for other bank accounts of any kind in petitioner's name.

ULTIMATE FINDINGS

Petitioner realized ordinary taxable income from the amounts he received from PAMEW in each of the years 1957–63, which he failed to report on his income tax returns for those years.

Petitioner's failure to include the above amounts in gross income reported on his returns for those years and his failure to pay tax thereon was due to fraud.

Petitioner's income tax returns for each of the years 1957–63 were false and fraudulent with intent to evade tax.

OPINION

Petitioner admits that certain amounts of income were omitted from his returns for each of the years 1957 through 1963, but he does not admit that this income was taxable in the years 1957 through 1960, prior to the decision of the U.S. Supreme Court in *James* v. *United States*, 366 U.S. 213 (1961); he also questions the amount of such income received in the years 1957 and 1958. Petitioner contends that, because the notice of deficiency was mailed to petitioner more than 3 years after his returns for those years were filed, assessment of deficiencies for the years 1957 through 1962 is barred by the statute of limitations, sec. 6501(a), I.R.C. 1954;[1] also that respondent has failed to carry his burden of proving fraud for any of the years 1957 through 1963 as required for the addition to tax under section 6653(b) of the Code. Respondent contends that the statute of limitations is inapplicable to the years 1957–62 under section 6501(c) because the returns for each of those years were false or fraudulent with the intent to evade tax; also that a part of the deficiencies in tax for each of the years 1957–63 is due to fraud so that the 50-percent addition to tax imposed by section 6653(b) should be assessed for each of those years.

The first issue is whether the unreported income received by petitioner from or through PAMEW in the years 1957–60 was taxable income; however, the issue of primary importance in the case is whether the omission of the items of income received by petitioner from PAMEW in each of the years 1957–63 was due to fraud with intent to evade tax.

Petitioner admits that he received amounts from PAMEW, under the scheme described in our Findings of Fact, in each of the years 1957–63 which he did not report on his returns, and admits that the amounts received in 1961–63 were taxable income. However, pe-

[1] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

titioner contends that PAMEW was a vehicle through which he embezzled funds from Gulf, that until the decision of the Supreme Court in *James* v. *United States, supra,* in 1961, embezzled funds did not constitute taxable income, and that because *James* by its own terms is not to be applied retrospectively, petitioner cannot be considered to have understated his income by the amounts received in 1957–60, whether or not his intent was fraudulent.

In *Commissioner* v. *Wilcox,* 327 U.S. 404, 408–409 (1946), the Supreme Court held that proceeds of embezzlement did not constitute taxable income to the embezzler.

Six years later, in *Rutkin* v. *United States,* 343 U.S. 130 (1952), the Court held that extorted funds did constitute taxable income to the extortionist; *Wilcox* was held limited "to its facts." 343 U.S. at 138.

Finally, in *James* v. *United States, supra* at 221–222, the Court definitively overruled *Wilcox:*

We believe that *Wilcox* was wrongly decided and we find nothing in congressional history since then to persuade us that Congress intended to legislate the rule. Thus, we believe that we should now correct the error and the confusion resulting from it, certainly if we do so in a manner that will not prejudice those who might have relied on it. We should not continue to confound [sic] confusion, particularly when the result would be to perpetuate the injustice of relieving embezzlers of the duty of paying income taxes on the money they enrich themselves with through theft while honest people pay their taxes on every conceivable type of income.

But, we are dealing here with a felony conviction under statutes which apply to any person who "willfully" fails to account for his tax or who "willfully" attempts to evade his obligation. In *Spies* v. *United States,* 317 U.S. 492, 499, the Court said that § 145(b) of the 1939 Code embodied "the gravest of offenses against the revenues," and stated that willfulness must therefore include an evil motive and want of justification in view of all the circumstances. Willfulness "involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income." *Holland* v. *United States,* 348 U.S. 121, 139.

We believe that the element of willfulness could not be proven in a criminal prosecution for failing to include embezzled funds in gross income in the year of misappropriation so long as the statute contained the gloss placed upon it by *Wilcox* at the time the alleged crime was committed. Therefore, we feel that petitioner's conviction may not stand and that the indictment against him must be dismissed.

[Citations omitted.]

Petitioner asserts that *James* by its own terms may not be applied retrospectively to find that he fraudulently understated his income for the years 1957 through 1960. *James'* language, however, makes clear that petitioner's assertion properly applies at most only to the issue of fraudulent intent and not to the question whether funds petitioner asserts he embezzled were in fact income before *James* was decided. Where no question has existed of willfulness or fraudulent intent,

lower Federal courts have recognized that *James* may be applied retrospectively to sustain deficiencies based on unreported sums embezzled before 1961. See *Geiger's Estate* v. *Commissioner*, 352 F. 2d 221, 228 (C.A. 8, 1965) ; *Adame's Estate* v. *Commissioner*, 320 F. 2d 811, 814 (C.A. 5, 1963), affirming in part and reversing in part 37 T.C. 807; *Marvin E. Nerem*, 41 T.C. 338, 344 (1963). As noted in *Marvin E. Nerem, supra,* see 41 T.C. at 344, such decisions are in accord with the general policy that—

The effect of * * * subsequent [judicial] decisions is not to make a new law but only to hold that the old law always meant what the court now says it means. The court has power to construe a legislative act, but it has no power by change in construction to date its passage as a law from the time of the later decision. * * * [*Fleming* v. *Fleming*, 264 U.S. 29, 31–32 (1924).]

We hold, therefore, that petitioner's returns for the years 1957 through 1960, as well as those for 1961 through 1963, did understate what was in fact his taxable income.

The crucial question is thus whether such understatements were fraudulent with intent to evade tax. As to the years 1961 through 1963, petitioner attacks only the sufficiency of the evidence, see *infra*. As to 1957 through 1960, however, petitioner's position is that *James* may not be applied retrospectively on the issue of intent and that if his improper receipt of funds in the years 1957 through 1960 was by embezzlement, he could not, as a matter of law,[2] have harbored fraudulent intent when he failed to report such receipts.

We must, perforce, decide whether the Supreme Court decision in *James* prohibits a finding in this case that for the years 1957–60 petitioner's failure to report the amounts he received from PAMEW in his tax returns was fraudulent with intent to evade tax. We must keep in mind the particular circumstances of this case and the fact that we are concerned here with proof of civil fraud rather than the criminal tax evasion involved in the *James* case which requires proof of willfulness beyond a reasonable doubt. The opinion in *James* v. *United States, supra*, stated only that:

the element of willfulness could not be proven in a criminal prosecution for failing to include embezzled funds in gross income * * * so long as the statute contained the gloss placed upon it by *Wilcox* at the time the alleged crime was committed.

Petitioner relies heavily on *Adame's Estate* v. *Commissioner, supra*, a case decided by the Court of Appeals for the Fifth Circuit,[3] to

---

[2] See *Adame's Estate* v. *Commissioner*, 320 F. 2d 811 (C.A. 5, 1963), affirming in part and reversing in part 37 T.C. 807, and *Kahr* v. *Commissioner*, 414 F. 2d 621 (C.A. 2, 1969).

[3] We note that the majority opinion in *Adame's Estate* was written by Chief Judge Lumbard of the Second Circuit, joined in by Judge Brown of the Fifth Circuit. Judge Hutcheson of the Fifth Circuit dissented.

which an appeal in this case would normally lie. (See *Jack E. Golsen*, 54 T.C. 742 (1970), in which this Court adopted the rule that it would follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals alone). While we doubt that *Adame's Estate* is squarely in point because of the difference in facts, we certainly must analyze it carefully to determine whether it supports or would prohibit the conclusion we reach here. We find it to be neutral as a directive to the correct conclusion in this case.

In *Adame's Estate* the taxpayer, who was a county superintendent of schools, devised a scheme to defraud the school districts by writing school district checks for more than the cost of supplies and pocketing the excess. In reversing this Court, 37 T.C. 807, the appellate court held that in the light of *James*, the failure to declare such unlawful gains (in the years 1948–53) could not be evidence of "fraudulent intent" and that whether the issue is the commission of crime by fraudulent evasion of taxes, or fraudulent intent which would toll a statute of limitations,

it would be equally improper to hold that the taxpayer's failure to declare monies was sufficient basis for inferring fraudulent intent when in both cases the law as it was understood at the time did not require him to report the monies as taxable income.

The court pointed out that there was no other evidence sufficient to support our findings, and a perusal of our opinion in *Adame's Estate* reveals that there was little evidence of fraud except the repeated failure to report the illegally obtained income. Here, as hereinafter pointed out, there is additional evidence of fraudulent intent.

We interpret the Court of Appeals opinion in *Adame's Estate* to mean that the failure to report embezzled income alone should not be used as evidence of fraudulent intent prior to the decision in *James*. We do not believe that it stands for the proposition that fraudulent intent, for civil tax purposes and the statute of limitations, in failing to report income illegally obtained by means other than embezzlement, cannot be proven by other evidence; or, necessarily, that fraudulent intent in failing to report embezzled income cannot be proven by other evidence.[4] We believe that *Adame's Estate*'s application of the Supreme Court's statement in *James* is consistent with the result intended to be accomplished there and does not distort the equitable doctrine espoused therein.

In *James* the Court had before it a taxpayer who had been convicted of criminal tax evasion for failing to report as income funds

---

[4] But compare *Kahr* v. *Commissioner, supra,* which held that the taxpayer, by failing to report funds embezzled, could not, in legal contemplation, have formed the intent necessary to commit tax fraud.

which he had pleaded guilty to embezzling. The Court emphasized that the criminal tax statute requires proof of willfulness, and the essence of its decision was that willfulness could not be established under the criminal standard of proof beyond a reasonable doubt for pre-*James* years when the apparent state of the law then allowed innocent nonreporting of embezzled funds. In contrast, the purpose of the statutes providing for an unlimited period of assessment and for a 50-percent addition to tax because of fraud in a tax return is not to impose a penalty—punishment, if appropriate, is provided by section 7201 *et seq.* The rationale, rather, is to protect the revenue and the Government against the consequences of the probable efforts to conceal his receipts forever of a taxpayer motivated by an intent to evade taxes. See *Helvering* v. *Mitchell*, 303 U.S. 391, 401 (1938). The purpose of *James* was to preclude criminal penalties for nonreporting of embezzled funds in pre-*James* years, not, as shown *supra*, to allow pre-*James* embezzlers to escape paying the full amount of taxes they rightfully owe. Our interpretation of *Adame's Estate* and our decision in the instant case are in accord.

In addition, in *James* the Court defined willfulness as including "an evil motive and want of justification in view of all the circumstances." [5] On the other hand, fraud within the meaning of the statutes now at bar has been held by the Fifth Circuit and this Court to mean "actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax *believed* to be owing. [Emphasis supplied.]" *Mitchell* v. *Commissioner*, 118 F. 2d 308, 310 (C.A. 5, 1941). See also *Marko Durovic*, 54 T.C. 1364, 1398 (1970). There has been some confusion in the definition of civil fraud, because some courts have substituted the word "known" for the word "believed" in the above quotation. [6] The Fifth Circuit has been rather consistent, but not entirely, in using the definition using the word "believed." See *Lee* v. *United States*, 466 F. 2d 11 (C.A. 5, 1972) ; *Webb* v. *Commissioner*,

---

[5] See statement of Mr. Justice Blackmun, in his opinion as a Circuit Judge in *Geiger's Estate* v. *Commissioner*, 352 F. 2d 221, 228, in discussing the prospective application of *James*: "This, however, does not prevent the application of James to a situation where willfulness is not a factor. The civil non-fraud tax liability of the Geigers is such a situation."

[6] It may be noted that the definition of fraudulent intent contained in *Kahr* v. *Commissioner*, *supra* (using the word "knows") appears to be the result of successive miscitations by several courts of the definition given by the Fifth Circuit in *Mitchell* v. *Commissioner*, 118 F. 2d 308 (C.A. 5, 1941). *Powell* v. *Granquist*, 252 F. 2d 56 (C.A. 9, 1958), cited *Mitchell* but added to *Mitchell's* definition the word "known" in parenthesis: "a tax *believed* (known) to be owing." (Emphasis added.) *Irolla* v. *United States*, 390 F. 2d 951 (Ct. Cl. 1968), citing *Mitchell*, removed the parenthesis and reversed the order of the words: "purpose to evade a tax *known or believed* to be owing." (Emphasis added.) Finally, *Kahr* (C.A. 2, 1969) removed the word "believed" altogether citing *Powell* and *Irolla* but not mentioning *Mitchell*: "an intent to evade taxes which the taxpayer *knows* are owed the Government." (Emphasis added.) This may help explain the narrow approach taken by the Second Circuit in applying *James* in *Kahr*.

394 F. 2d 366 (C.A. 5, 1968). But see *Tomlinson* v. *Lefkowitz*, 334 F. 2d 262 (C.A. 5, 1964). We recognize that the two terms, "believed" and "known," have been used interchangeably at times without harm, but we believe the use of the correct word "believed" is important in deciding the question we have before us because of the peculiar circumstances.

Under the definition prevalent in the Fifth Circuit and in this Court, it is enough that a taxpayer intends to evade taxes which he *believes* are owed the Government. That the rationale behind the addition to tax for civil fraud is remedial and not punitive, as *supra*, is convincing that the definition using the term "believed" is correct. In cases such as the one at bar, the revenue may be protected and the Government indemnified for extra expense only if the intent to evade taxes is measured by *belief* that taxes are being evaded rather than by *knowledge* that they are. This distinction in the meaning of the word "fraud" is important in this case because of the confusion in the law of Texas and the uncertainty in the law generally as to what constitutes embezzlement.

It would be practically impossible for respondent to prove that petitioner "knew," in the legal sense, that the amounts he received from PAMEW were taxable income, and that tax was due thereon. *Wilcox* held that embezzled funds were not taxable in the year appropriated. *James*, upon which petitioner relies, held that willfulness could not be proven for failing to include embezzled funds in gross income while *Wilcox* was viable. Furthermore, by the time petitioner filed his returns for the years here involved, the Supreme Court had decided *Rutkin* v. *United States*, *supra*. In *Rutkin* the Court held that money obtained by extortion was taxable income and affirmed the conviction of the taxpayer for willfully attempting to defeat and evade income taxes by failing to report such income. In doing so, the Court concluded that unlawful gain, as well as lawful gain, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it; and that unlawful gains secured by fraud of the taxpayer are taxable. The Court found it unnecessary to consider *Wilcox* because of the difference in factual situations involved, but limited *Wilcox* to the facts in that case. For respondent to prove fraudulent intent under *James*, or under the definition of those courts which have used "knows" instead of "believes," he would have to prove by clear and convincing evidence that petitioner had examined the statutes and the cases and concluded either that *Rutkin* had totally vitiated *Wilcox*, as the Supreme Court subsequently decided in *James*, or that his activities did not constitute "embezzlement," see *infra*.

Such a burden would clearly be impossible to meet, whereas it would be feasible for respondent to prove that, whatever the state of the law, petitioner in fact *believed* his improper receipts to be taxable and accordingly took steps to conceal those receipts from the Government forever.

Our conclusion here is buttressed by the existence of confusion in Texas law and uncertainty in the law generally as to what constitutes embezzlement.[7] We think that under both the laws of Texas[8] and the general principles of embezzlement enunciated by the Federal courts after *Wilcox*, petitioner's activities by which he came into possession of the funds at issue here more closely resembled "swindling" than embezzlement. There is at least sufficient uncertainty that it would be unreasonable to assume without inquiry that petitioner believed his activities to be embezzlement so he could not, in legal contemplation, have had the intent to evade taxes by failing to report the amounts received.[9]

Article 1534 of the Texas Penal Code provides, with respect to embezzlement, that if any officer, agent, or employee of a corporation or private person—

shall embezzle, fraudulently misapply or convert to his own use, without the consent of his principal or employer, any money * * * of such principal or employer which may have come into his possession or be under his care by virtue of such office, agency or employment, he shall be punished * * *

Article 1545 of the Penal Code defines "swindling" as:

the acquisition of * * * money * * * by means of some false or deceitful pretense or device, or fraudulent representation, with intent to appropriate the same to the use of the party so acquiring * * *

The Texas courts have defined embezzlement as the fraudulent appropriation of the personal property of another by one to whom it has been entrusted, *Leonard* v. *State*, 7 Tex. Crim. 417 (1879), while to constitute swindling, they require that some false pretense as to an existing fact or past event be made in order to obtain the property, *Johnson* v. *State*, 41 Tex. 65 (1874), and in *Akers* v. *Scofield*, 167 F. 2d

---

[7] See fn. 5 to Mr. Justice Blackmun's opinion in *Geiger's Estate* v. *Commissioner, supra.*

[8] Uncertainty exists whether Texas law should govern whether petitioner's acts constituted embezzlement within the meaning of *Wilcox* and *James.* Reference to State law regarding embezzlement was made in *Wilcox* itself and in *United States* v. *Jannsen,* 339 F. 2d 916, 918 (C.A. 7, 1964). But in *Marienfeld* v. *United States,* 214 F. 2d 632 (C.A. 8, 1954), the Eighth Circuit flatly rejected arguments that State embezzlement statutes should be applied or that *Wilcox* intended to require reference to State laws in this context. In accord is *United States* v. *Wyss,* 239 F. 2d 658 (C.A. 7, 1957).

[9] We think the distinction between embezzlement and misappropriation of funds by other illegal means is important in this context, where we are trying to decide whether petitioner could have had a fraudulent intent while *Wilcox* was viable, because the rationale of the *Wilcox* opinion likened embezzlement to a loan, where there is an acknowledged obligation to repay. We find no such similarity present in the circumstances in this case.

718 (C.A. 5, 1948), the court, in finding a swindle, stated that the distinction between embezzlement and swindling is that in the former title to the property acquired never passes while in the latter title does pass. In this case while it is true that petitioner was an employee of Gulf and it was by virtue of his employment that he was able to activate the scheme under which he obtained the funds, he did not appropriate the funds directly to himself; he induced Gulf to pay excessive amounts to PAMEW by use of false invoices indicating that more work had been done than was actually done. When Gulf paid the excessive amounts to PAMEW, the latter deposited the funds in its own bank account and title passed to PAMEW. Petitioner then received a part of the excessive funds from PAMEW. While petitioner's activities may have technically constituted embezzlement as well, it seems clear that the funds were obtained through false representation which constituted a swindle.

*Wilcox*, again, dealt only with embezzlement, which, as noted above, seems unlikely to have been the exact means by which petitioner obtained the funds which he failed to report. As *supra*, the tax years here involved came after the Supreme Court had decided *Rutkin* which undercut the rationale of *Wilcox* and limited that decision to its facts. It was in the climate of the law created by the combination of *Wilcox* and *Rutkin*, not in the climate of *Wilcox* alone, that petitioner would have had to form the belief that the funds he received from PAMEW were nontaxable in order to escape liability here.[10] Because of the considerable doubt that petitioner received the unreported funds through embezzlement as used in *Wilcox*, and because *Rutkin* limited *Wilcox* to its own facts, we think it was perfectly possible that, "in legal contemplation," petitioner could have had the intent to evade taxes that he believed to be due when he failed to report this income on his returns. We see no reason to extend the equitable doctrine used by the Supreme Court in *James* beyond the bounds we believe it was intended to encompass.

Since we have concluded that *James* does not prohibit a finding of fraudulent intent in this case, we now must turn to the evidence to determine whether fraud has been proven. Respondent has the burden of proving fraud by clear and convincing evidence. We find that he has done so, even without reliance on petitioner's mere failure to report the income as evidence of his fraudulent intent, which may (or may not) be prohibited by *Adame's Estate* v. *Commissioner, supra*.

It is clear from the evidence that petitioner devised a scheme to swindle and defraud his employer, Gulf, and that he carried out this

---

[10] Petitioner did not testify at the trial of this case so we have no direct evidence of his actual state of mind.

scheme during the years 1957–63 with the cooperation of W. O. Nelson, the owner of PAMEW.[11] Petitioner has admitted that he received funds during those years as a result of that scheme, which he did not report on his tax returns. It also appears, by inference at least, that petitioner kept no record of these receipts or transactions; the evidence shows that he denied receiving any such funds to the revenue agent who audited his returns for the years involved. While evidence that a taxpayer was attempting to defraud another in a business transaction may not be direct evidence of fraud with intent to evade tax, see *Toledano* v. *Commissioner*, 362 F. 2d 243, 247 (C.A. 5, 1966), the Court is entitled to consider such evidence along with other evidence in determining the intent of the taxpayer in doing certain acts, because it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax. *Rogers* v. *Commissioner*, 111 F. 2d 987 (C.A. 6, 1940). The legal relevancy of such evidence is based upon logical principles which go to negate innocent intent. *United States* v. *Bridell*, 180 F. Supp. 268 (N.D. Ill. 1960) ; *Pappas* v. *United States*, 216 F. 2d 515 (C.A. 10, 1954).

We also find significance in the fact that petitioner received kickbacks from PAMEW in cash which could not be identified in his accounts or in cash deposits to his bank account. The receipt of cash rather than checks from PAMEW would be unimportant in petitioner's efforts to conceal his fraud from Gulf, but it would be important in concealing his income from the Government. Weight can also be given to the fact that petitioner reported the kickbacks he received from GCMC, which reported these payments to the Government on Treasury Forms 1099. Petitioner argues that this was done because GCMC received no excess funds from Gulf and petitioner knew that nonembezzled kickbacks were taxable income even under *Wilcox*. However, we note that petitioner continued to treat the receipts from GCMC and PAMEW differently for tax-reporting purposes even after *James* had removed the distinction, taxwise, between embezzled funds and funds unlawfully obtained in other ways. We think it is more logical to assume that petitioner reported his receipts from GCMC prior to 1961 on his tax returns because he knew that the Government had notice of them but that he did not report his receipts from PAMEW because he thought he could conceal them from the Government as well as Gulf.

And finally, petitioner continued failing to report his income from PAMEW for several years after the *James* case was decided, which

---

[11] W. O. Nelson died several months before the trial of this case.

should have removed any doubt from his mind, even in legal contemplation, that those funds were taxable income. Such a consistent pattern of conduct with regard to the income received from PAMEW both before and after the *James* decision is quite convincing that petitioner was not relying on the possibly nontaxable nature of the income prior to *James* in failing to report that income on his returns, but rather, that he was attempting to conceal that income with intent to evade tax. If petitioner was relying on *Wilcox* in not reporting the income he received from PAMEW, he had ample opportunity to so advise the Revenue Service and this Court.

We conclude from the record as a whole that respondent has carried his burden of proving fraud under both sections 6501(c) and 6653(b). This is particularly true with regard to the years 1961–63 when petitioner could not possibly have been relying on *Wilcox* and the rationale of *James*, and consideration is given to the repeated omissions of substantial amounts of taxable income as additional evidence of fraudulent intent. See *Estate of Millard D. Hill*, 59 T.C. 846, 856 (1973); *Anderson* v. *Commissioner*, 250 F. 2d 242 (C.A. 5, 1957); *Bryan* v. *Commissioner*, 209 F. 2d 822 (C.A. 5, 1954). Hence, assessment of the deficiencies for the years 1957–63 is not barred by the statute of limitations; and the 50-percent additions to tax determined to be due by respondent for each of those years is sustained. The purpose of the addition to tax is well served in this case: The precise amount by which petitioner's income was understated in the years in question appears still to be uncertain, and the record shows that the Government was indeed caused extra expense in attempting to undo petitioner's efforts at concealment. The addition is thus appropriate to protect the revenue and indemnify the Government.

As to the amount of the deficiencies asserted by respondent, petitioner's only challenge is to the size of the cash payments respondent determined petitioner received from PAMEW. Petitioner's assertion that he received no cash at all is contradicted by the record. While petitioner made some effort to rebut respondent's determination with reference to several cash payments reflected on PAMEW's books, we do not find that he has succeeded in showing that respondent's determination in this regard was arbitrary or unreasonable or in overcoming the presumptive correctness of respondent's determination; thus, respondent's determination must stand. *Welch* v. *Helvering*, 290 U.S. 111 (1933); Rule 32, Tax Court Rules of Practice.

Because of certain concessions made by the parties,

*Decision will be entered under Rule 50.*