LARRY M. SENDERHAUF and ERIKA M. RADICH (formerly ERIKA M. SENDERHAUF), Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; LARRY M. SENDERHAUF, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Senderhauf v. Commissioner
Docket Nos. 8158-82, 8159-82.
United States Tax Court
T.C. Memo 1984-265; 1984 Tax Ct. Memo LEXIS 408; 48 T.C.M. (CCH) 125; T.C.M. (RIA) 84265; May 16, 1984. *408 Held: Respondent failed to prove fraud by clear and convincing evidence. Assessment and collection of deficiencies in tax and additions to tax is barred by the statute of limitations. Stanley L. Drexler, for the petitioners. Benjamin A. de Luna, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined the following deficiencies and additions to tax in petitioners' 1971 and 1972 Federal income taxes: Addition to Tax
Petitioner
Year
Deficiency
section 6653(b) [1]
Larry M. senderhauf
1971
$1,317.01
$ 648.95
Larry M. Senderhauf
1972
$6,977.08
[2] $3,488.54
Erika M. Radich (formerly
Erika M. Senderhauf)
The assessment and collection of the deficiencies and additions to tax herein is barred unless the unlimited assessment period specified in section 6501(c)(1), relating to false or fraudulent returns, is applicable. Therefore, the primary issue is whether any part of *409 the underpayments for these years was due to fraud. The parties have stipulated to most of the material facts regarding the amounts of unreported income and petitioners offered no evidence to prove errors in respondent's determination of taxable income. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner Larry M. Senderhauf (petitioner) resided in Denver, Colorado at the time he filed his petitions herein. He filed an individual Federal income tax return for 1971 with the Internal Revenue Service Center in Austin, Texas. Petitioner Erika M. Radich (formerly Erika M. Senderhauf) resided in Keene, New Hampshire at the time she filed her petition herein. Petitioners filed a joint Federal income tax return for 1972 with the Internal Revenue Service Center in Ogden, Utah. Erika is a party to this action solely by reason of signing the joint return for 1972, and hereafter we shall refer to Larry Senderhauf as petitioner. Petitioner grew up in Oshkosh, Wisconsin, and graduated from high school there. He never attended college. After high school he worked *410 in a factory in Oshkosh, and later, after being laid-off, worked as a clerk in a grocery store. During that time he was married and had one child. In late 1970, petitioner moved from Oshkosh to Denver, Colorado in search of employment. He was 22 years old, and recently divorced. He worked briefly as a bartender. In late 1970 or early 1971, petitioner was referred by a career broker to Larry Glist, who operated a rental referral agency known as Homefinders of America, Inc. (Homefinders). Petitioner obtained a job as a rental counselor with Homefinders in its Denver office and worked in that capacity until March 1971. Homefinders was conceived and organized by Glist, who was the principal owner of the business. Homefinders started in Denver, and later expanded into other cities around the country by means of a pyramid-like network of franchise and subfranchise agreements. Homefinders provided lists of rental properties to people in need of houses and apartments. For $20, customers purchased a "rental policy" which entitled them to rental information for a one-year period at any Homefinders office. In March 1971, petitioner left Denver and opened a Homefinders franchise office *411 in Colorado Springs, Colorado. Glist loaned petitioner money to open the business. In return for receiving the franchise rights, petitioner agreed to pay Glist ten percent of his gross receipts from the sale of rental policies. This was the standard franchise arrangement Glist used in establishing new Homefinders offices. Petitioner initially ran the Colorado Springs office by himself. During the summer of 1971, he hired Rick Safford, who he knew from Oshkosh. Like petitioner, Safford had no college degree and no prior business experience. Petitioner was not knowledgeable about accounting or recordkeeping. Initially he had no method of bookkeeping other than saving the receipts from policies. At the end of each week he would count the number of policies sold to determine the amount of franchise fees to be paid to Glist. Later, sometime during the summer of 1971, petitioner purchased a General Business Systems (GBS) book, which was a simple single-entry bookkeeping system that recorded checks issued and bank deposits. When petitioner opened the Colorado Springs office, he opened an account with a local bank. However, he continued to maintain an account with the First Wisconsin *412 Bank in Oshkosh, which had been his family's bank. Petitioner had opened the account sometime after high school and he maintained the account because he had a history of credit there, knew the manager, and was able to borrow money for his business. In August of 1971, petitioner sold the Colorado Springs operation to Safford. No cash was exchanged in the transaction; Safford assumed petitioner's liabilities in return for the furniture, fixtures and assets of the business. Petitioner and Safford entered into a subfranchise agreement, according to which Safford would pay to petitioner ten percent of his gross receipts, in addition to the ten percent Safford was required to pay to Glist. After selling the Colorado Springs operation, petitioner moved to Albuquerque, New Mexico to open another Homefinders franchise. He took the GBS book with him, and continued to use it at the Albuquerque office. He also hired a bookkeeper to maintain the GBS journal and other records. However, petitioner himself continued to neglect this aspect of the businss, and did not maintain any filing system.His practice was to stuff policy receipts, cash receipts, bank statements and other records in a desk *413 in his office. In February of 1972, petitioner met John Philpott, who owned Safeguard Business Systems of New Mexico. Philpott sold petitioner a Safeguard recordkeeping system. This was a simple "one-write" system which recorded checks written and bank deposits. Philpott also agreed to perform bookkeeping services for petitioner. Philpott was not a certified public accountant or public bookkeeper. He performed such services only for petitioner, partly as a favor, although he was paid about $40 per month. Philpott generally came into the Homeowners office once a week and spent one to four hours per visit performing his bookkeeping duties. During 1972, Homefinders expanded rapidly into various cities around the country, and petitioner played a key role in the growth of the business. He opened a franchise in Arlington, Virginia, and also had subfranchises for various periods of time in El Paso and Dallas, Texas and Norfolk, Virginia, in addition to the Colorado Springs arrangement with Safford. Petitioner was one of four people, including Glist, who comprised the nucleus of the organization. Although all Homefinders offices were individually franchised through the home office *414 in Denver and paid franchise fees to Glist, petitioner was one of several individuals to whom Glist gave the opportunity to develop subfranchises. Petitioner trained new employees and helped the most promising of them establish offices under subfranchise agreements. He was a "group leader," and periodically held meetings of the subfranchisees under his supervision in order to instruct them in various aspects of the business. These subfranchisees generally operated their businesses independently, but were required to pay franchise fees of ten percent of gross receipts to both Glist and petitioner. Although petitioner's "group" within Homefinders expanded geographically as he developed franchises and subfranchises during 1972, he retained the Albuquerque office as his home base. He hired people to manage the Arlington franchise. Petitioner spent a considerable amount of time travelling to the various offices under his supervision. Consequently, he relied on Philpott to maintain the books and records in the Albuquerque office, and he devoted little attention to these matters. In the spring of 1972, petitioner contacted Robert Kleinschmidt, a longstanding friend from Wisconsin, and *415 asked him to help organize his growing business. Kleinschmidt had a B.A. degree in Business and was working towards a masters degree in economics at the University of Massachusetts.He agreed to spend the summer working for petitioner in the Albuquerque office. Kleinschmidt soon discovered that the Albuquerque office was poorly organized and that the recordkeeping system was inadequate. Kleinschmidt's first task was to sort through the mass of disorganized papers that petitioner had stuffed into desk drawers and establish a filing system. Kleinschmidt found that the simple bookkeeping system used by Philpott was not adequate to reflect all the income and expenses of the business. Part of the problem was the failure of the Safeguard system to account for cash receipts and disbursements. Although petitioner occasionally withdrew cash from the business [3] and paid business expenses with cash, Philpott's Safeguard system accounted only for checks drawn on and deposits to the Albuquerque bank account. Philpott also did not integrate the Wisconsin bank account into his bookkeeping system. *416 During 1971 and 1972, petitioner made deposits to that account, and also paid some business expenses from that account. The records related to the Wisconsin bank account were kept in the desk with petitioner's other records, to which Philpott had unrestricted access. Kleinschmidt developed and implemented a recordkeeping system based on daily cash reports, which recorded all cash receipts, disbursements and bank deposits. Petitioner gave Kleinschmidt complete freedom and responsibility to reorganize this aspect of the business. Philpott understood that he was to follow Kleinschmidt's instructions. Kleinschmidt had discussions with Philpott concerning the importance of using the daily cash reports so that income would be recorded accurately. He also sent daily cash report forms to the Arlington office. In addition to implementing the daily cash reports, Kleinschmidt undertook a comprehensive analysis of the books and records of the business for the first half of 1972, and prepared income statements for both the Albuquerque and Arlington offices. Because of the deficiencies of the Safeguard system, Kleinschmidt had to count the policies issued in order to determine gross revenues. *417 In the process of reorganizing the office and preparing his financial statements, Kleinschmidt discovered the records of the Wisconsin bank account in the desk used by Philpott. He filed these with the other financial records, and incorporated them in his income statements. The objective of Kleinschmidt's efforts was to develop an accurate financial picture of the busiess which could then be maintained by the use of the daily cash reports. Prior to Kleinschmidt's efforts, Philpott had prepared monthly financial statements for petitioner, using the information from the GBS and Safeguard journals. These reports tended to understate income due to the limitations of the "one-write" bookkeeping system. Philpott had previously become aware of the possibility that all of the income was not being accounted for when he discovered a discrepancy between the amount of franchise fees paid to Glist and the amount of deposits to the Albuquerque bank account. He reported the discrepancy to petitioner, who indicated that they would have to "tighten up" the bookkeeping. After Kleinschmidt prepared his financial statements which reflected additional income, Philpott reworked his July income statement *418 to conform to Kleinschmidt's figures. Philpott used the daily cash reports devised by Kleinschmidt to prepare monthly financial statements during July and August. However, after Kleinschmidt left Albuquerque at the end of the summer, Philpott ceased using the daily cash reports and returned to using the Safeguard system, which reflected only deposits made to the Albuquerque bank account. Although petitioner received franchise fees from his subfranchisees during 1972, Philpott did not account for these receipts unless they were deposited to the Albuquerque bank account. [4]
In September 1972, petitioner attended a convention of Homefinders franchisees at Florissant, Colorado. glist organized and conducted the convention, which was attended by approximately 25 people. The main topic was a scheme proposed by Glist by which Homefinders could evade Federal income tax. One aspect of the scheme involved the reporting of only 50 percent of gross receipts for tax purposes, and concealing half of the receipts by means of a duplicate bookkeeping system. *419 In addition, Glist directed the franchisees to send only half of the franchise fees by check, and to send the other half by cash or money order. [5]
Petitioner was opposed to the tax evasion scheme proposed by Glist. After the main meeting where Glist presented the scheme, petitioner met with his group of subfranchisees. He indicated that they should comply with the company policy regarding the form of franchise fee payments to Glist, but he did not endorse the tax evasion scheme and encouraged them to pay their individual taxes. Petitioner was concerned that the scheme would jeopardize the success of Homefinders. He had several discussions with Homefinders' corporate counsel during which he expressed his opposition to the scheme and sought advice as to how he could follow company policy and still pay his own taxes. In April 1973, Homefinders held another convention at Lake City, Colorado. Glist announced that the company was abandoning the scheme to evade taxes, and that franchisees should report *420 all their income. Glist changed his position in large part because of pressure from petitioner and corporate counsel. The tax evasion scheme proposed at the Florissant convention primarily concerned the form of the franchise payments to Glist. glist did not issue instructions regarding the payments of subfranchise fees. However, after the Florissant convention, petitioner began to receive some franchise fees in the form of cash and money orders. [6]
After the Florissant convention, Oran Massie, the manager of the Arlington franchise, began to deposit only half of the gross receipts in the checking account. Consequently, only half of the gross receipts were reflected in the Safeguard Business System ledger of the Arlington office. However, in accordance with Kleinschmidt's instructions, daily cash reports were prepared in the Arlington office which accurately reflected the number of policies sold. The bookkeepers Massie employed had access to these daily cash reports. Petitioner purchased money orders and travelers checks at various times *421 during 1971 and 1972.Some money orders were purchased with cash. Some money orders were deposited in petitioner's Wisconsin bank account. Philpott prepared petitioner's Federal income tax returns for 1971 and 1972. Philpott at all times had access to all of petitioner's financial records, including the records of the Wisconsin bank account. Petitioner relied entirely on Philpott to prepare accurate tax returns, and signed both the 1971 and 1972 returns without analyzing them. Philpott obtained the figures for Schedule C of petitioner's 1971 return from the GBS ledger used in the Colorado Springs and Albuquerque offices. Petitioner did not inform Philpott about wages he earned in early 1971 as a bartender and as a rental counselor in the Denver office of Homefinders. These omissions totalled $1,056. Petitioner also did not tell Philpott about the sale of the Colorado Springs office to Safford, because he did not consider that transaction to have produced any income. Petitioner realized a long-term capital gain of $678 from the sale. Petitioner's 1971 return stated his adjusted gross income to be $705.30. The parties have stipulated to the following items for petitioner's 1971 *422 taxable year: Bank Deposits
$53,352.12?1
Cash Disbursements
1,817.18?1
Net Capital Gain
339.00?1
Non-income Items
(6,746.66)
Business Expenses
(41,804.76)
Adjusted Gross Income [7]
$ 6,956.88?1
(based on stipulated items)
Philpott prepared petitioners' 1972 joint return primarily from figures obtained from the Safeguard ledger in the Albuquerque office, and an income statement he received from the bookkeeper of the Arlington office. Philpott had access to the records of the Wisconsin bank account at the time he prepared the return. In connection with preparing the return, he made adjustments to the Arlington income statements. These adjustments concerned additional business expenses paid by checks drawn on the Wisconsin account. However, Philpott relied exclusively on the deposit entries in the Safeguard ledger, and on the Arlington income statement, to determine petitioners' gross receipts. Consequently, the 1972 return did not reflect certain deposits to the Wisconsin account. Petitioners' *423 1972 joint return stated their adjusted gross income to be $25,307.23. [8] The parties have stipulated to the following items for petitioners' 1972 taxable year: Bank Deposits
$256,237.09?1
Cash Disbursements
27,401.11?1
Non-income Items
(39,882.61)
Business Expenses
(188,252.68)
Adjusted Gross Income [9]
$ 55,502.91?1
(based on stipulated items)
Petitioners claimed a standard deduction of $2,000 and two exemptions, and stated their taxable income to be $21,807.23.Petitioners reported and paid total taxes of $4,718.92. During 1973 and 1974, petitioner was contacted at various times by respondent's special agent in connection with a criminal investigation of his 1971 and 1972 income tax liabilities. Petitioner cooperated fully with the investigation. In compliance with an administrative summons, he provided records from both the Albuquerque and Arlington offices, including ledgers, daily cash reports, and records of franchises fees *424 received. He also cooperated in a question and answer session that lasted several days, during which he volunteered additional information. Respondent's agents obtained petitioner's bank records directly from the banks. The Wisconsin bank account was located by tracing a transfer item to that account from the Colorado Springs account. At the conclusion of his investigation, respondent's special agent recommended that petitioner be prosecuted for attempting to evade tax under section 7201 and for signing false returns under section 7206(1), with respect to years 1971 and 1972. The case was declined for prosecution by the United States Attorney in Albuquerque. Subsequently, petitioner, Glist, and several other persons associated with Homefinders were indicted for conspiracy to evade taxes, and a jury trial was commenced in the United States District Court for the District of Colorado in April, 1977. After four days of trial, the Court dismissed the charges. Glist later pleaded guilty to a separate count of tax evasion. The statutory notices of deficiency herein were issued on January 15, 1982. ULTIMATE FINDINGS OF FACT No part of the underpayments of petitioners' Federal income *425 tax for the years 1971 and 1972 was due to fraud with the intent to evade tax. The Federal income tax returns filed by petitioners for 1971 and 1972 were not false or fraudulent with the intent to evade tax. OPINION The primary issue is whether any part of the underpayments of petitioners' Federal income tax for the years 1971 and 1972 was due to fraud. Based on the stipulations, it is clear that petitioners' returns for these years understated their income by roughly $6,000 in 1971 and $30,000 in 1972, and petitioners do not dispute the existence of these underpayments.However, the assessment and collection of the deficiencies and additions to tax is barred by the statute of limitations unless the unlimited assessment period specified in section 6501(c)(1), relating to false or fraudulent returns, is applicable. [10]
Respondent has the burden of proving, by clear and convincing evidence, that some part of *426 the underpayment for each year was due to fraud. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Stone v. Commissioner,56 T.C. 213, 220 (1971). To meet this burden, respondent must show an intentional wrongdoing on the part of the taxpayer with the specific purpose of evading a tax believed to the owing. Stoltzfus v. United States,398 F.2d 1002, 1004 (3rd Cir. 1968); Powell v. Granguist,252 F.2d 56, 60 (9th Cir. 1958); McGee v. Commissioner,61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Because direct proof of fraudulent intent is rarely available, respondent may meet his burden of proof through circumstantial evidence. Stone v. Commissioner,supra at 223-224, Otsuki v. Commissioner,53 T.C. 96, 106 (1969). However, fraud is never presumed, and must be affirmatively established by clear and convincing evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). The mere understatement of income is not sufficient to establish *427 fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner,supra;Stone v. Sommissioner,supra at 224. The inquiry into the taxpayer's alleged fraudulent intent, rarely an easy task, is made more difficult in this case by the unusually long period of time which has elapsed between the events in question and this proceeding. We are faced with the task of reconstructing a picture of the operations of a geographically diverse and loosely organized business, based on the testimony of witnesses whose recollections of critical events and the nuances surrounding them are blurred by the passage of time and in some cases colored by conflicting interests. The two primary contentions upon which respondent relies to prove fraud -- that petitioner withheld information from his bookkeeper and employed the methods of tax evasion suggested at the convention -- are especially subject to conflicting and vague testimony. Although the overt tax avoidance scheme proposed by Glist casts a shroud of suspiction over the entire operations of Homefinders, this is not sufficient to satisfy respondent's burden to show that petitioner *428 fraudulently underreported his own income. When the smoke is cleared away and the ambiguities and inconsistencies are resolved in favor of petitioner by virtue of respondent's burden of proving fraud by clear and convincing evidence, we are unable to find any intentional acts of petitioner designed to understate his income tax liability. The crucial inquiry is the role Philpott played in maintaining the books and records of the business and preparing petitioners' returns, and whether or not petitioner concealed from Philpott certain sources of income and bank records. Respondent contends that, pursuant to a plan of tax avoidance, petitioner diverted income to the Wisconsin bank account, concealed the records of the account, and instructed Philpott to record as income only the deposits to the Albuquerque account. This is simply not supported by the evidence. The picture that emerges from the record is one of a young, inexperienced businessman with no knowledge of accounting, who relied on a bookkeeper who was not capable of maintaining a system of accounting which adequately reflected the operations of the business. Petitioner had no experience managing a business prior to his *429 association with Homefinders. He was only 22 years old when he met Glist, and his prior work experience consisted of a job in a factory, clerking in a grocery store, and bartending. He had no knowledge of accounting, no familiarity with recordkeeping, and apparently no interest in learning about such matters. This is evident from the lack of a filing system and his haphazard method of determining gross receipts by counting the policy receipts he stuffed into desk drawers.
Philpott was in the business of selling Safeguard Business Systems, so his partiality to that bookkeeping method, even when it became obvious that the one-write system could not adequately account for all of the cash receipts, is not surprising. Philpott was not a CPA, and apparently performed bookkeeping services for petitioner because he liked him and was interested in Homefinders. Petitioner was not interested in this aspect of the business, and delegated complete responsibility to Philpott. The evidence does not support respondent's contention that petitioner concealed the Wisconsin bank records from Philpott. Those records were kept in the same desk with all the other business records; Philpott worked at *430 that desk and had unrestricted access to its contents. [11] Moreover, it is clear that Philpott referred to certain checks written on the Wisconsin account when making adjustments to the Homefinders income statements in connection with preparing the 1972 return. In light of these facts, Philpott's testimony that he was not aware of the Wisconsin account prior to 1974 is not credible. Petitioner's effort in hiring Kleinschmidt to reorganize the office and develop an effective bookkeeping system refutes respondent's contention that he planned to understate his income. Kleinschmidt had a strong background in business and accounting.He realized that Philpott's Safeguard system did not account for all of the income of the business, and he developed the daily cash reports in response to this problem. These reports were designed to ensure that all cash receipts were accounted for. Kleinschmidt revised the mid-year income statements to correct for cash receipts excluded by Philpott's system. However, despite petitioner's instructions to Philpott that he was to follow Kleinschmidt's directions, Philpott ceased using the daily cash reports *431 when Kleinschmidt left at the end of the summer, and reverted to the deficient Safeguard system. Based on the testimony of Kleinschmidt, who we found to be a straightforward and credible witness, we think the most likely explanation of the underreporting of income for these years was Philpott's stubborn persistence in using the Safeguard system, even after it became obvious to him that it could not accurately account for all the income. Respondent also relies heavily on petitioners' attendance at the Homefinders convention in September, 1972 where Glist outlined a tax avoidance scheme. However, respondent's contention that petitioner himself employed these procedures to evade his own taxes, and that he directed his managers and subfranchisees to assist him in this effort, is contrary to the record.
Far from participating in the tax avoidance scheme, the record indicates that petitioner was strenuously opposed to the plan from the outset, and that his protests contributed to the abandonment of the scheme. Petitioner was concerned that the scheme would jeopardize the future of Homefinders. Yet, he was not in a position to directly countermand Glist's instructions. Although petitioner *432 may have told his group members to follow company policy regarding the form of payments to Glist, there is no convincing evidence that he instructed them to make subfranchise fee payments to him by cash or money order, or to conceal half of their receipts. [12] *433 Rather, the evidence indicates that he encouraged his subfranchisees not to underpay their own taxes. Thus, while the tax avoidance scheme proposed by Glist at the Florissant convention may warrant close scrutiny of petitioner's conduct, respondent's inability to show any action of petitioner to implement the scheme reduces this argument to little more than guilt by association. "[C]ourts should not sustain findings of fraud upon circumstances which at the most create only suspicion." Davis v. Commissioner,184 F.2d 86, 87 (10th Cir. 1950). Respondent's contention that petitioner attempted to conceal information from respondent's agents during the investigation of his tax liability is equally without foundation. Petitioner appears to have cooperated fully with the investigation.He allowed respondent's agents unrestricted access to the Albuquerque office, and turned over the ledgers, policy receipts, and daily cash reports. He volunteered additional information at a question and answer session. There is no evidence that petitioner attempted to conceal bank records, as respondent contends. Although respondent's agent testified that he obtained the bank records directly from the banks, there is nothing to indicate that petitioner, prior to that, had refused to supply those records. On the contrary, petitioner appears to have gone out of his way to accomodate respondent's agents during the investigation. In short, respondent has failed to produce convincing evidence of any of the typical hallmarks of fraud. We do not think the underreporting for these two years can be accurately characterized as a pattern *434 of "consistent and substantial understatement of income," as respondent alleges on brief. Although there may be some uncertainties regarding the operation of the various subfranchises under petitioners' supervision, we are unable to find any intentional acts of petitioner intended to conceal income. Petitioner may have been very negligent in his delegation of bookkeeping duties to Philpott and his failure to ensure that Kleinschmidt's accounting system was implemented, but this falls short of satisfying respondent's burden of proving fraud by clear and convincing evidence. Because we find that respondent has failed to prove that the underpayments in question were due to fraud, the provisions of section 6501(c)(1) are not applicable, and the statute of limitations provided in section 6501(a) bars the assessment and collection of the deficiencies herein. [13] *435 Accordingly, Decision will be entered for the petitioners in Docket No. 8158-82.
Decision will be entered for the petitioner in Docket No. 8159-82.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue. ↩
2. The addition for fraud was not determined against Erika M. Radich, who is a party to this action solely because she signed a joint return in 1972 with Larry M. Senderhauf.↩
3. Petitioner's cash withdrawals were recorded on the daily cash reports developed by Kleinschmidt.↩
4. Petitioner kept accurate records of the franchise fees received during 1972, but these records were not integrated into the Safeguard system.↩
5. The minutes of this convention were typed and distributed in memorandum form to the attendees. The cover page of the memorandum stated in large print: "Destroy completely after reading."↩
6. Some money orders received by petitioner in January 1973 were made payable to cash, and were signed by the purchasers with fictitious names.↩
7. Petitioner stipulated only to the individual items listed, and not to any figure as his correct adjusted gross income. However, petitioner has not produced any evidence of additional expenses or non-income items.↩
8. Erika Senderhauf earned wages of $281.33 in 1972. ↩
9. Petitioners stipulated only to the individual items listed, and not any figure as their correct adjusted gross income. However, petitioners have not produced any evidence of additional expenses or non-income items.↩
10. Section 6501 provides in pertinent part: (c) Exceptions.-- (1) False Returns.↩--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.
11. See Dagon v. Commissioner,T.C. Memo 1984-138↩.
12. Respondent relies on the testimony of Oran Massie, the manager of the Arlington franchise, to show that petitioner directed his subfranchisees to make payments by cash or money orders. Yet, Massie only testified that petitioner instructed him to "follow the procedures," and this may have referred only to the payments to Glist. Massie's testimony was generally vague and inconsistent. Other more credible witnesses testified that they did not remember receiving such instructions from petitioner.
13. It is clear that petitioner has endured a long, sometimes bitter dispute, involving both criminal and civil proceedings. Respondent waited almost five years after the criminal trial was dismissed to send the notices of deficiency herein. Perhaps the acrimony surrounding the criminal proceedings explains respondent's persistence in pursuing such relatively modest deficiencies at such a late date; it seems that this matter has consumed an inordinate amount of resources of all concerned.