NASSER G. AFSHAR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Afshar v. Commissioner
Docket No. 6099-72.
United States Tax Court
T.C. Memo 1981-241; 1981 Tax Ct. Memo LEXIS 503; 41 T.C.M. (CCH) 1489; T.C.M. (RIA) 81241; May 18, 1981. *503 During 1958 through 1962, P represented himself to various U.S. companies as a person of influence in obtaining contracts with the government of Iran. Based on P's representations, such companies "advanced" money to P to secure contracts. P did not render services on behalf of such companies, and P never repaid the funds advanced to him. During such period, P claimed to have incurred business expenses on behalf of such companies in excess of the funds he received. Also, during such period, P did not file Federal income tax returns or make estimated tax payments. Held, the amount of P's deductible business expenses determined. Held, further, P received gross income from swindling during each of the years in issue, and P's failure to file returns and report such income was due to fraud. Held, further, P is liable for the penalty for failure to pay estimated tax imposed by sec. 6654, I.R.C. 1954. Helen E. Marmoll, for the petitioner. Ruud L. Duvall, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioner's Federal income taxes: Additions to Tax
Sec. 6653(b)
Sec. 6654
Year
Deficiency
I.R.C. 1954 [1] *504 I.R.C. 1954
1958
$ 73,250.18
$ 36,625.09
$ 2,047.04
1959
15,001.61
7,500.81
415.04
1960
45,489.89
22,744.95
1,267.67
1961
21,188.58
10,594.29
587.23
1962
21,867.73
10,933.87
605.98
The issues for decision are: (1) Whether the petitioner incurred business, travel, and entertainment expenses in excess of the amounts allowed by the Commissioner; (2) whether there was any underpayment of tax due to fraud within the meaning of section 6653(b); and (3) whether the petitioner is liable for additions to tax under section 6654 for underpayment of estimated taxes. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Nasser G. Afshar, resided in Alexandria, Va., at the time he filed his petition in this case. The petitioner was born in Teheran, Iran. He became a naturalized citizen of the United States in 1952, and since that time, he has resided in the United States. He is married to a native-born U.S. citizen. During the years in issue, 1958 through 1962, the petitioner lived with his wife and children in Glen Ridge, N.J. Since 1969, the petitioner has resided in Virginia. The petitioner stipulated that during the years in issue he received gross income from the following persons in the amounts shown: Payor
1958
1959
1960
Fluor Corporation,
Ltd.
$ 124,811.72
$ 27,568.82
$ 13,753.34
D.W. Winkelman
Co., Inc.
22,405.00
28,874.32
Grant M. Scruggs,
Jr.
2,000.00
Johnson, Drake &
Piper, Inc.
3,600.00
J.E. Greiner
Company
Procon,
Incorporated
27,000.00
C.J. Langenfelder
& Son, Inc.
20,000.00
Panama-Williams
Corporation
Brookhart & Tyo
Missouri Valley
Dredging Company
Total
$ 124,811.72
$ 51,973.82
$ 93,227.66
Payor
1961
1962
Fluor Corporation,
Ltd.
D.W. Winkelman
Co., Inc.
Grant M. Scruggs,
Jr.
Johnson, Drake &
Piper, Inc.
J.E. Greiner
Company
$ 1,000.00
$ 27,500.00
Procon,
Incorporated
12,500.00
1,000.00
C.J. Langenfelder
& Son, Inc.
10,000.00
Panama-Williams
Corporation
19,500.00
5,000.00
Brookhart & Tyo
11,500.00
Missouri Valley
Dredging Company
5,000.00
Total
$ 43,000.00
$ 50,000.00
*505 In addition, in 1961, the petitioner received dividend income of $ 63.75 and had short-term capital gains of $ 8,989.82. In 1960, he had a short-term capital loss of $ 1,000.00. Such dividend income, gains, and loss were the result of transactions through a brokerage account he maintained with H. Hentz & Co., a New York City brokerage firm. In 1957, the petitioner had been discharged in bankruptcy. Fluor Corporation
In late 1957, the petitioner contacted Richard Lyon, the international sales manager for Fluor Corporation, Ltd. (Fluor), to inquire if Fluor would be interested in building a refinery for the Iranian government. Fluor was a large international engineering and construction firm headquartered in Los Angeles, Calif. Mr. Lyon arranged a meeting between the petitioner and Mr. Ellsworth, the executive vice president of the Engineering and Construction Division of Fluor. At such meeting, the petitioner represented that he had been selected by the Iranian government to secure a responsible contractor to build a contemplated oil refinery at Qum, Iran, where oil had recently been discovered. The purpose of such meeting was to determine whether Fluor was interested in pursuing *506 the possibility. Subsequent meetings were held between the petitioner and senior officers of Fluor at Fluor's Los Angeles offices. Such meetings were also exploratory in nature. The petitioner assured Fluor's officers that he was at least 90 percent sure that with his support Fluor would be selected to build the Qum refinery. Fluor's officials agreed that if the petitioner could secure such project, or if the Iranian government would accept Fluor for the project, Fluor would pay the petitioner a reasonable commission. The petitioner indicated that he desired a 2-1/2 percent commission on the entire contract price. However, no specific figure was ever agreed upon and no written agreement was ever made. Orally, the petitioner agreed that he would bring a negotiating team from Teheran to Los Angeles, at his own expense, and that his commission, if any, would depend on the size and type of the contract obtained by Fluor. In February 1958, the petitioner telephoned Mr. Ellsworth and requested $ 8,092.34 to cover the purchase price ($ 7,055.72) and shipping charges ($ 1,036.62) for two automobiles. The petitioner claimed that it was customary when a project is awarded to make such *507 a gift to the person responsible for giving the contract. Fluor complied with such request. In February 1958, the petitioner purchased two 1958 model Chevrolets: a sport sedan and a corvette. The purchase price for such automobiles was $ 7,055.72. In February 1958, the petitioner again telephoned Mr. Ellsworth and requested $ 5,500, which was paid to him. Subsequently, when the petitioner claimed that he needed more funds, he telephoned either Mr. Ellsworth or Mr. Lyon and requested that they send him money. Such funds were to be used by the petitioner to cover his expenses in bringing the Iranian negotiating team to Los Angeles. On a monthly basis, such payments ranged from a low of $ 1,000 in October 1959 to a high of $ 47,000 in April 1958. From February 1958 through March 1960, Fluor paid to the petitioner $ 105,500. In February 1958, at the petitioner's request, Fluor furnished an air travel card to the petitioner. From April 1958 through September 1960, Fluor paid charges on such travel card of $ 52,433.57. Such charges ranged from a low of $ 305.25 in September 1958 to a high of $ 14,197.00 in May 1958. On April 8, 1958, as a result of the petitioner's representations, *508 Fluor's officers began making tentative arrangements for a party of Iranians who were to arrive in Los Angeles during the week of April 14th. On April 14, 1958, the petitioner sent Mr. Ellsworth a telegram which stated: "EVERYTHING IS ARRANGED ARRIVING NEW YORK * * * ALONE WILL CALL YOU AFSHAR." On or about April 17, 1958, the petitioner advised Mr. Lyon that the Iranian party had been delayed due to a change in the Shah's marital status. He advised Mr. Lyon that the negotiating party would arrive in Los Angeles the end of April. The party was to consist of Iran's European ambassador and head of its United Nations delegation in Europe, the Minister of Finance, the speaker of the lower house of government, two Iranian senators, and a director of the Iranian National Oil Company. The petitioner also represented to Mr. Lyon that the Shah's daughter and the ex-prime minister's son might accompany the negotiating party. On April 25, 1958, the petitioner sent a telegram to Mr. Ellsworth that there would be a delay in the negotiating party's arrival. On May 6, 1958, Mr. Lyon received a telegram from the petitioner which stated: "I WILL CALL YOU DATE OF OUR ARRIVAL SOON. DO NOT BE CONCERNED *509 LATE ARRIVAL EVERYTHING FINE." The petitioner continued to advise Fluor's officers that the party would be arriving shortly. The expected arrival date was changed to October, then to November, to December 1958, and on into 1959. The negotiating party never arrived in Los Angeles; nor did the petitioner ever produce any Iranian officials to discuss the proposed oil refinery contract. In 1960, Fluor's officers informed the petitioner that they were not going to make any further payments to him; the last such payment was made in March 1960. However, after Fluor terminated cash payments to the petitioner, he continued to use the air travel card. Fluor asked that such travel card be returned, but the petitioner continued to use it after such request was made. Finally, Mr. Ellsworth threatened that if the petitioner did not return the card, Fluor was going to refuse to honor any further charges on it. Fluor refused to make further payments to the petitioner because its officers came to the conclusion that he was unable to deliver a contract or to do what he said he could do. An internal memo of Fluor dated November 1960 concluded that the petitioner was "no more than an adventurer." *510 Also, Fluor's officers were aware that charges had been incurred on the air travel card for persons who could not have been involved with the promised contract. Except for claims by the petitioner, Fluor's officers had no knowledge that he performed any services on Fluor's behalf; nor did Fluor receive any benefits from the petitioner's services. The petitioner never accounted to Fluor, nor was he asked to do so, for any of the funds paid to him or for charges on the air travel card. At the outset, Fluor assumed that such amounts would be deducted from the petitioner's commission when it received the oil refinery contract. Fluor considered such payments and charges as advances against the petitioner's commission. No restrictions were placed upon the petitioner as to his use of the funds advanced to him. After Fluor concluded that it would not receive a contract for the oil refinery, it never requested repayment from the petitioner, since it assumed that the effort and expense would exceed what it could expect to recover. All of the payments to the petitioner were claimed as deductions by Fluor on its Federal corporate income tax returns under the heading of "Professional Services." *511 No Forms 1099 or W-2 were issued by Fluor with respect to the payments to the petitioner. In 1963, Fluor received a subcontract from a German firm to construct an oil refinery in Iran. However, the petitioner had nothing to do with Fluor obtaining such subcontract. In 1970, the petitioner filed suit against Fluor for commissions on such contract. Such suit was dismissed. A second suit was also dismissed. Mr. Ellsworth was aware of the existence of an Iranian company of the petitioner's father, H. Afshar and Company, but all of Fluor's dealings were with the petitioner. Except for a few telegrams, all dealings between Fluor and the petitioner were oral. Grant M. Scruggs, Jr. In 1958, Grant M. Scruggs, Jr., was the exclusive U.S. agent for the Puutalo Group of Helsinki, Finland (Puutalo). Puutalo sold prefabricated wooden housing and wooden components. In November 1958, Mr. Scruggs was introduced to the petitioner by the petitioner's attorney, Edward M. Swinburne. Mr. Swinburne informed Mr. Scruggs that the petitioner had a great deal of influence with the Shah of Iran and the people surrounding the Shah and that the petitioner could assist Mr. Scruggs in obtaining a large *512 housing contract. Mr. Scruggs entered into an oral agreement with the petitioner, wherein the petitioner would arrange for a delegation of Iranians to go to Helsinki for the purpose of negotiating a contract for the purchase of several thousand prefabricated houses. If a contract with the Iranians was executed, the petitioner was to be paid a commission for his services. The petitioner never indicated to Mr. Scruggs that he represented anyone other than himself as employee or agent. In January 1959, Mr. Scruggs received a telephone call from the petitioner requesting funds to bring the Iranian delegation to Helsinki to negotiate the housing contract. Pursuant to the petitioner's request, Mr. Scruggs directed his banker to wire $ 2,500 to the petitioner in Switzerland. Later in January, the petitioner again telephoned Mr. Scruggs requesting an additional $ 1,500 to bring the Iranian delegation to Helsinki. Mr. Scruggs directed his banker to wire the additional $ 1,500 to the petitioner in Switzerland. The agreement between Mr. Scruggs and the petitioner was that the funds were to be used solely to pay the delegation's travel expenses from Iran to Helsinki; the petitioner was *513 to pay his own expenses. The petitioner never brought an Iranian delegation to Helsinki although Mr. Scruggs waited in Helsinki for them. The petitioner agreed to account to Mr. Scruggs as to the expenditure of the funds advanced to him. However, he never did so, although on several occasions, he was requested to do so by Mr. Scruggs. Upon his return to New York City, Mr. Scruggs informed Mr. Swinburne that his $ 4,000 had been taken by the petitioner under false pretenses. In March 1959, after Mr. Scruggs threatened to sue the petitioner, a settlement agreement was negotiated by Mr. Swinburne. Pursuant to such agreement, the petitioner agreed to pay Mr. Scruggs' banker $ 2,000 in airline tickets in exchange for Mr. Scruggs' signing a general release. Mr. Scruggs agreed to such arrangement, since he felt that such arrangement was the only means of recovering anything from the petitioner. The airline tickets were purchased with the air travel card issued to the petitioner by Fluor. D.W. Winkelman Co., Inc. In late 1959, the petitioner entered into an oral agreement with D.W. Winkelman, president of D.W. Winkelman Co. , Inc. (Winkelman Co.). Winkelman Co. was a construction *514 contractor, specializing in highway construction. The petitioner and Mr. Winkelman agreed that the petitioner would represent a joint venture, of which the Winkelman Co. was a party, and would obtain information to aid the joint venture in the preparation of proposals to be submitted for road construction contracts in Iran. The petitioner represented himself to be an Iranian citizen who was well acquainted in Iran and could expedite the obtaining of construction contracts. The petitioner's representations were very persuasive; Mr. Winkelman was convinced that a contract would be obtained within a month or two after the date of the oral agreement. Mr. Winkelman agreed to advance the petitioner funds to meet his expenses incurred on behalf of the joint venture. If a contract was obtained, the petitioner, if he wished, was to be employed as an interpreter and consultant and was to be given an opportunity to participate in the joint venture. The petitioner agreed that whether or not he was successful in obtaining a contract, he would personally reimburse Winkelman Co. for any funds advanced to him. At the time the agreement was entered into, it was anticipated that the petitioner's *515 expenses would not exceed $ 15,000. On November 23, 1959, Winkelman Co. issued a check to the petitioner in the amount of $ 5,555. Such check represented the first payment to the petitioner and was to be used by him to finance his expenses in connection with obtaining information relating to construction contracts in Iran. In anticipation of additional requests, Winkelman Co. opened a checking account in the name of the petitioner upon which he could draw with Winkelman Co.'s approval. From December 4, 1959, through April 7, 1960, the petitioner wrote 29 checks on such account, totaling $ 45,724.32. Except for a $ 200.00 check payable to American Express and a $ 424.32 check payable to Rogers Peet Company, all of such checks were payable either to cash, the petitioner, or the Societe de Banque Suisse. Winkelman Co. treated the funds advanced to the petitioner as prepaid engineering expenses, since it was believed that such funds would be charged against a specific contract. Winkelman Co. did not issue Forms 1099 or W-2 with respect to the payments to the petitioner. From December 1959 through April 1960, the petitioner gave Mr. Winkelman various reasons for his inability to *516 produce any results. However, he consistently reassured Mr. Winkelman that his acquisition of the desired information was imminent. In April 1960, Mr. Winkelman refused to advance any further funds to the petitioner. The reason for such action was that the petitioner had not produced any tangible or recognizable accomplishments on behalf of Winkelman Co. After their initial meeting, the only communications between the petitioner and Mr. Winkelman consisted of telephone calls when the petitioner claimed to need more funds. The petitioner has never accounted to Winkelman Co. as to the use of the funds advanced to him. The petitioner has never repaid any of such funds, despite his oral agreement to do so and despite repeated requests by Winkelman Co. for repayment. However, the petitioner continued to reassure Mr. Winkelman that such monies would be repaid, even after Winkelman Co. cut off all funds to the petitioner. Winkelman Co. employed attorneys in an effort to collect the funds advanced to the petitioner, but no legal proceedings were ever instituted to enforce collection of such funds. Winkelman Co. never did any work in Iran, nor were discussions ever had with Iranian *517 officials. Except for claims by the petitioner, Mr. Winkelman has no knowledge that the petitioner performed any services on behalf of Winkelman Co.; nor did Winkelman Co. receive any benefit from the petitioner's services. The petitioner did not represent to Mr. Winkelman that he was a representative or employee of H. Afshar and Company. Johnson, Drake & Piper, Inc. On several occasions during the first half of 1960, the petitioner contacted Robert P. Bayard, who was the foreign manager and executive vice president of Johnson, Drake & Piper, Inc., General Contractors (JDP). The petitioner represented to Mr. Bayard that he might be of great assistance in selling a "package job" to the Iranian government for engineering and construction of a proposed highway in Iran. JDP's share of such package job was to be 90 percent and would cover construction services. The petitioner stated that it would be necessary for him to travel to Iran to pursue the matter further and that he could, and would, pay his own travel expenses.The petitioner estimated that the total cost for such trip, including his time in Iran, would be $ 4,000. In June 1960, shortly before he was to have left for Iran *518 to pursue the package job, the petitioner advised Mr. Bayard that he had been unable to collect certain funds due him for services rendered. Mr. Bayard agreed to advance the petitioner 90 percent of his estimated travel expenses, $ 3,600. The other 10 percent of such travel expenses was to be paid by Erdman, Smock, Hosley & Reed, Inc., the engineering firm which was to receive the other 10 percent of the package job. On June 13, 1960, JDP issued a check to the petitioner in the amount of $ 3,600. It was orally agreed that if a contract were obtained, such amount was to be deducted from the petitioner's commission, although no agreement had been reached as to a specific commission arrangement. If a contract was not obtained, the petitioner was not required to repay the $ 3,600. No restrictions were placed on the petitioner's use of such $ 3,600. After the check was delivered to the petitioner, Mr. Bayard never heard from the petitioner again. Mr. Bayard has no knowledge of what epxenses the petitioner incurred or what use was made of the $ 3,600. Also, Mr. Bayard has no knowledge of what services, if any, the petitioner performed for JDP. JDP never requested repayment of *519 such funds, nor has legal action been taken to collect such funds from the petitioner. JDP did not issue a Form 1099 or a Form W-2 with respect to the payment to the petitioner. On its Federal income tax return, JDP deducted such payment as a foreign promotion expense. J.E. Greiner Company
In the middle of 1960, the petitioner was introduced to Edward J. Donnelly, who was a partner of J.E. Greiner Company (Greiner Co.), a consulting engineering firm in Baltimore, Md. The petitioner represented that he was "well connected" in Iran and that he could obtain for Greiner Co. a general management agreement with the Iranian government. Preliminary meetings were held, and thereafter, the petitioner informed Mr. Donnelly that Greiner Co. was acceptable to the Iranian government. In the fall of 1961, the petitioner entered into an oral agreement with Greiner Co., wherein the petitioner agreed to represent Greiner Co. in securing from the Iranian government a contract to act as general advisor for Iran's 7-year plan. The petitioner was to be paid a fee of $ 500 per week for his services and expenses. Pursuant to such agreement, Greiner Co. paid the petitioner $ 1,000 in 1961 and $ 17,500 *520 in 1962. From August 13, 1962, through December 31, 1962, his weekly compensation checks, at his request, were drawn payable to his wife, Yvonne Afshar. During 1962, checks payable either to the petitioner or to his wife totaling $ 5,250 wer endorsed by the petitioner's attorney, Edward M. Swinburne. In addition to his weekly compensation, Greiner Co. made a $ 10,000 payment to the petitioner in 1962. Such payment was made at his request and was cabled to him in Geneva, Switzerland. The petitioner was not required to account to Greiner Co. as to how the funds paid to him were spent, and he has never done so. No restrictions were placed on the petitioner's use of the funds paid to him. The petitioner was under no obligation to repay the funds paid to him, and he has not repaid them. Greiner Co., with the petitioner's assistance, prepared a proposed agreement for submission to the Iranian government. On September 13, 1962, Greiner Co. mailed such agreement to the petitioner in Geneva, Switzerland. However, such agreement was never acted upon. Greiner Co. never discussed any other projects with the petitioner, nor did it receive any project layouts from the Iranian government. *521 Except for claims by the petitioner, Mr. Donnelly has no knowledge that the petitioner rendered any services or expended any funds on behalf of Greiner Co. In his dealings with Greiner Co., the petitioner represented himself to be an American citizen who operated as an individual. The Greiner Co. issued Forms 1099 to the petitioner showing compensation of $ 1,000 received during 1961 and $ 27,500 during 1962. Such forms were mailed to the petitioner at his residence in Glen Ridge, N.J. Procon, Incorporated
In October 1960, the petitioner met with the president, C. B. Whyte, and the vice president, C. B. Robbins, of Procon, Incorporated (Procon), which was located near Chicago, Ill. Procon was a construction company specializing in petroleum refineries and chemical plants. Such meeting was arranged by Mr. Donnelly of Greiner Co., who had recommended Procon to the petitioner. The petitioner had commissioned Mr. Donnelly to locate a qualified engineering and construction company to build a contemplated refinery near Teheran, Iran. The petitioner told Messrs. Whyte and Robbins that Greiner Co. had been selected by the Iranian government as consulting engineers on several large *522 projects, including the construction of the refinery. The petitioner represented that he had submitted Procon's name to the Iranian government for approval, and that he had been authorized to negotiate with Procon on Iran's behalf. However, the terms of the actual contract would be negotiated between Procon and other representatives of the Iranian government. In the discussions with Procon, the petitioner did not represent himself to be an official of the Iranian government, but he claimed to be a close personal friend of the Shah and his personal representative in the selection of contractors. The petitioner stated that the Shah had asked him to find qualified contractors because of the unsatisfacory experience the Iranians had had with certain contractors. The petitioner advised Procon's officers that he would attempt to aid them in securing an oil refinery construction contract. Later in October, another meeting was held with Procon, at which the petitioner again advised Messrs. Whyte and Robbins that Greiner Co. was the consulting engineer on the refinery project. However, the petitioner emphasized that he was to be Procon's only contact and that they were to have no direct *523 contact with Greiner Co.
On November 16, 1960, Procon entered into a letter agreement with the petitioner, which provided that Procon would prepare a preliminary economic feasibility report to be presented to the appropriate Iranian officials by the petitioner. After he presented the report, the petitioner was to use his best efforts to bring the appropriate Iranian officials to Procon's offices to view its facilities and to discuss further the feasibility report. To accomplish such objectives, Procon agreed to advance $ 20,000 to the petitioner. Such funds wer to be used for the necessary travel and living expenses of the petitioner and the Iranian officials who were to visit Procon's offices. The petitioner agreed to document his expenditures with appropriate travel and expense vouchers, which were to be forwarded to Procon. If a contract were obtained, the funds advanced were to have been included in the overall base bid or otherwise were to be reimbursed to Procon. If a contract was not obtained, the petitioner was not obligated to repay the funds advanced. The initial $ 20,000 was deposited to the petitioner's account at the Riggs National Bank, Washington, D.C. From December *524 1960 through September 1962, the petitioner requested and received the following additional advances from Procon: Date
Amount
Form of Remittance
12/7/60
$ 7,000
Wire transfer to Geneva,
Switzerland
1/26/61
6,000
Check
3/28/61
3,000
Wire transfer to Geneva,
Switzerland
10/10/61
3,500
Check
9/13/62
1,000
Check
On October 10, 1961, the petition executed a letter agreement supplementing the letter agreement of November 16, 1960. In the supplemental agreement, the petitioner acknowledged receipt of the funds advanced to that date, $ 39,500, and agreed to forward to Procon appropriate documentation as to his expenditure of such funds. The supplemental agreement reiterated that the funds advanced to the petitioner were for the petitioner's necessary travel and promotional expenses in connection with the refinery project. The petitioner has never submitted vouchers to Procon or otherwise substantiated his expenditures, although he has been requested to do so on several occasions. The petitioner has not repaid the funds advanced to him, although he has never been asked to do so, and Procon has never taken any legal action to recover such funds. The petitioner did not produce a contract for Procon. Except *525 for the claims by the petitioner, Mr. Robbins has no knowledge that the petitioner performed any services on behalf of Procon.In 1977, the petitioner sued Procon claiming damages for breach of an agency agreement, but such suit was dismissed as untimely. [2]
On advice of its tax counsel, Procon did not issue a Form 1099 to the petitioner for 1960.However, Forms 1099 were issued to the petitioner for 1961 and 1962, showing compensation of $ 12,500 in 1961 and $ 1,000 in 1962. On its Federal income tax returns, Procon claimed deductions for the amounts paid to the petitioner either as a prepaid sales expense or as a sales promotion expense.At that time, Procon used the completed contract method of accounting. During the years in issue, Mr. Robbins was not aware of whether the petitioner had a business address in Iran. C.J. Langenfelder & Son, Inc. In late 1960, the petitioner entered into an oral agreement with C.J. Langenfelder & Son, Inc. (Langenfelder & Son), which was a contractor in Baltimore, Md., specializing in highway construction. The terms of such agreement provided that the petitioner would present Langenfelder *526 & Son's qualifications to the Iranian government for consideration in performing heavy construction work within Iran. The petitioner represented to Langenfelder & Son's officers that he could obtain for them heavy construction projects on a cost-plus basis. However, no specific project was ever discussed. At the petitioner's request, Langenfelder & Son prepared an elaborate brochure describing the company's history and accomplishments. The petitioner was to present such brochure to the Iranian government. The petitioner represented that his main interest was in Iran's welfare and that, by securing for Iran a competent, financially independent heavy contractor, he would help Iran to build utilities and provide employment. The petitioner requested an advance of $ 10,000, which was to be repayable upon demand whether or not a contract was obtained. On November 21, 1960, Langenfelder & Son issued a check to the petitioner in the amount of $ 10,000. On December 7, 1960, Langenfelder & Son advanced an additional $ 10,000 to the petitioner, which was wired to him in Geneva, Switzerland. A third advance of $ 10,000 was paid to the petitioner on February 3, 1961. The timing and amounts *527 of such advances were the result of the petitioner's requests, which were made orally, either in person or via telephone. Langenfelder & Son treated such payments as advances, not as compensation, which were expected to be repaid. The petitioner assured Langenfelder & Son's officers that they could request repayment at any time. No restrictions were placed on the petitioner's use of such advances, nor was he required to account for their expenditure. The petitioner has never repaid the $ 30,000 advanced to him by Langenfelder & Son, nor has he ever accounted to Langenfelder & Son as to his expenditure of such $ 30,000. In 1964, Langenfelder & Son wrote off such advances as bad debts in its books and records. During the years in issue, Charles H. Scheeler was general manager of Langenfelder & Son's accounting department, and at the time of trial, he was president of such company. Mr. Scheeler has no knowledge of the services rendered by the petitioner on Langenfelder & Son's behalf or any benefits received through the petitioner's efforts. Nor does he have any knowledge whether the petitioner was ever requested to repay or account for the funds advanced to him. During the years *528 in issue, the only address for the petitioner known by Mr. Scheeler was in New Jersey.No Forms 1099 or W-2 were issued to the petitioner by Langenfelder & Son. Brookhart & Tyo
In 1962, Mr. Donnelly of Greiner Co. introduced the petitioner to G. Clinton Brookhart, partner of the firm of Brookhart & Tyo, Consulting Engineers (Brookhart & Tyo). The petitioner represented that he was in a position to become Administrator of Public Works in Iran and that he was attempting to negotiate a contract to make Greiner Co. overall consultants on public works projects in Iran. The petitioner represented that Brookhart & Tyo would be granted some of such public works projects. The petitioner and Mr. Brookhart discussed the preliminary layouts on a "dock project." No written agreement was reached with the petitioner, but orally, Brookhart & Tyo agreed to advance funds to the petitioner for his travel expenses incurred in connection with the public works contracts.Brookhart & Tyo made the following advances to the petitioner: Date
Amount
4/30/62
$ 4,000
7/30/62
2,500
11/15/62
5,000
$ 11,500
The requests for such advances were made by the petitioner via telephone. The petitioner has never accounted to Brookhart *529 & Tyo as to how such funds were expended, but an accounting was never requested. As of January 1964, the petitioner had not negotiated the public works contract. Mr. Brookhart understood that the delay was due to internal conditions in Iran. Brookhart & Tyo did not issue a Form 1099 or a Form W-2 to the petitioner. On its Federal partnership return, Brookhart & Tyo claimed a deduction for such payments as business expenses. Both Mr. Brookhart and Raymond J. Tyo are now deceased. Panama-Williams Corporation/Missouri Valley Dredging Company
In late 1961, the petitioner met with M.S. Williams, president of Panama-Williams Corporation (Panama-Williams), and Joe G. McMaken, president of Missouri Valley Dredging Company (Missouri Valley). Both Panama-Williams and Missouri Valley were engaged in pipeline construction. At such meeting, the petitioner represented that he had certain connections in Iran that would be necessary if Panama-Williams or Missouri Valley was to obtain a pipeline construction contract in Iran. Mr. Williams believed that some "payoffs" would be required in order to obtain such a contract and that the petitioner was probably the person in the United States who *530 handled such matters. The petitioner assisted Mr. Williams and Mr. McMaken in preparing a letter to the Shah offering the services of their companies in the construction of oil pipelines. In addition, the petitioner advised Messrs. Williams and McMaken that to obtain a construction contract it would be necessary for him to bring a team of technical personnel from Iran to the United States to evaluate their proposal. The cost of such trip was to be paid by Messrs. Williams and McMaken. It was mutually agreed that $ 12,000 would be needed for such purpose. On December 5, 1961, Mr. Williams issued a check to the petitioner in the amount of $ 12,000. The petitioner converted such check into traveler's checks. At such time, Messrs. Williams and McMaken did not enter into a contract with the petitioner. However, it was understood that if a contract was obtained, the petitioner was to share in the profits from such a contract. Approximately 2 weeks later, the petitioner telephoned Mr. Williams from Geneva, Switzerland. He advised Mr. Williams that it would be necessary to bring more personnel to the United States than he had originally anticipated. The petitioner estimated that *531 the inclusion of the additional personnel would entail an additional expenditure of $ 7,500 and requested that Mr. Williams cable such amount to him in Geneva. On December 19, 1961, Mr. Williams complied with the petitioner's request. In February 1962, the petitioner again telephoned Mr. Williams from Geneva. He advised Mr. Williams that it was unlikely that the original deal would go through, but that there were other deals that might be worked out. The petitioner told Mr. Williams that he had already spent the $ 19,500 advanced to him and that he needed an additional $ 5,000 to work on a new deal. At such time, the petitioner promised to repay the funds advanced to him. Mr. Williams was reluctant to advance any additional funds to the petitioner. However, the petitioner indicated that he needed the additional $ 5,000 immediately. In an effort to salvage something from the money already advanced, Mr. Williams cabled to the petitioner the $ 5,000 requested by him. Subsequently, Mr. Williams learned that the petitioner had already obtained $ 5,000 from Mr. McMaken. In May 1963, the petitioner telephoned Mr. Williams and told him that funds which had been "tied-up" in Switzerland *532 has recently become available, that he was going to mail a check to Mr. Williams for part ofthe money he owed to Messrs. Williams and McMaken, and that he would pay the balance of the money owed in June. Mr. Williams never heard from the petitioner again. The petitioner never repaid the funds advanced to him, nor has he accounted for his expenditure of such funds. The petitioner never produced any technical personnel to discuss any projects with Mr. Williams or Mr. McMaken. Panama-Williams never received a contract to do work in Iran. Mr. Williams has no personal knowledge of whether the petitioner traveled to Iran on his behalf, nor is he aware of whether the petitioner had a business address other than his home in New Jersey. Panama-Williams did not issue a Form 1099 or a Form W-2 to the petitioner. Business Expense Deductions
During the years in issue, the petitioner traveled extensively in the United States and Europe. He traveled to Iran once each year during the month of March.He incurred substantial expenses in connection with such travel. Also, during such period, he incurred substantial telephone expenses. In his notice of deficiency, the Commissioner allowed the *533 petitioner the following deductions for business expenses: 1958
1959
1960
1961
1962
Hotels
$ 163.47
$ 1,047.31
$ 2,217.58
$ 598.01
Telephone
647.48
$ 550.12
1,448.37
1,528.12
1,430.97
Air Travel
11,289.06
12,907.11
9,736.56
316.00
Total
$ 12,100.01
$ 13,457.23
$ 12,232.24
$ 4,061.70
$ 2,028.98
IRS Investigation of the Petitioner
In early 1961, the IRS commenced its investigation of the petitioner. In connection with such investigation, search requests were directed to several District offices to determine if there was a record of returns having been filed by the petitioner.Such searches were made under the petitioner's and his wife's first names, last name, and middle names, as well as various spellings of such names, and several possible addresses. The dates of such searches, the District offices to which they were directed, and the years searched were as follows: District Office
Date of Search
Searched
Request
Years Searched
Newark, N.J.
4/18/63
1947-1961
4/6/64
1962
International
11/1/63
1962
Operations
4/2/64
1957-1961
Manhattan, N.Y.
4/17/63
1947-1961
7/18/63
1947-1961
11/1/63
1962
Brooklyn, N.Y.
4/17/63
1947-1961
11/1/63
1962
Baltimore, Md.
5/24/63
1957-1961
11/1/63
1962
Augusta, Maine
4/19/63
1947-1961
11/1/63
1962
Such searches revealed *534 no record of Federal income tax returns having been filed by the petitioner or the payment of estimated taxes by him in any of the years searched. If the petitioner had filed any return using his Glen Ridge, N.J., address, such a return should have been filed with the Newark District office. If the petitioner had filed any return using an Iranian address, such a return should have been filed with the Office of International Operations. In 1978 and 1979, the IRS again undertook a search to determine if there was a record of returns having been filed by the petitioner. The service centers to which such search requests were directed were as follows: Service Center
Years Searched
Brookhaven, N.Y.
1953-1970
Philadelphia, Pa.
1952-1970
Andover, Mass.
1958-1970 The search at the Philadelphia Service Center disclosed a return that had been filed by the petitioner for 1968 with the Office of International Operations. It also revealed that something had been filed by the petitioner in 1952; however, because of the age of the record, it was not possible to determine the nature of such filing. Such searches disclosed no record of returns having been filed by the petitioner for the years 1958 through *535 1962. If the petitioner had filed any return using his Glen Ridge, N.J., address, the record of such return would have been located in the Brookhaven Service Center. If the petitioner had filed any return using an Iranian address, the record of such return would have been located in the Philadelphia Service Center. In 1963, the petitioner and his attorney, Mr. Swinburne, filed with the IRS applications for extension of time to file the petitioner's 1962 return. The reason given by the petitioner for such extension was that he had not received documentation of his expenses from overseas and that therefore an accurate return could not be prepared. On the application for extension dated September 18, 1963, which was signed by the petitioner, he stated that returns had been filed from overseas for two of the three prior years (1959, 1960, and 1961). The reason given for not filing a return for one of such years was that the petitioner had no income during such year. As of 1965, Mr. Swinburne admitted that the petitioner had not filed completed returns for 1961 and 1962. In 1965, a criminal information was filed against the petitioner in the U.S. District Court in Newark, N.J. *536 Such information alleged a willful failure to file Federal income tax returns for the years 1958 through 1962. In 1969, the Government dropped the other counts of such information, and the petitioner pled nolo contendere to such charge for 1958 and was fined $ 2,000 and was placed on probation for 1 year. In June 1961, the petitioner and Mr. Swinburne met with the special agent in charge of the investigation of the petitioner. At such meeting, the petitioner stated that he had filed Federal income tax returns from overseas for the years 1957 through 1959.The petitioner promised to obtain copies of such returns from Iran and make such copies available for inspection. At such meeting, the petitioner admitted receiving $ 3,600 from JDP but claimed that such funds were in the nature of an advance and were not income to him. Allegedly due to the petitioner's frequent travels, the next meeting between the petitioner and the special agent was not held until January 4, 1962. At such time, the petitioner made available checks issued by his wife during 1958. The petitioner stated that he had filed returns with the Office of International Operations for the years 1957 through 1960, that *537 copies of such returns were in Iran, and that he would obtain copies of such returns whenever possible. The petitioner further stated that he had no income during such years and that all funds received by him during such period were either loans from relatives or advances for expenses. On January 17, 1962, Mr. Swinburne advised the special agent that the petitioner's tax records were in Mr. Swinburne's office and that he would advise the special agent when the records were available for his examination. On April 19, 1962, another meeting was held with the special agent. At such meeting, the special agent again requested that the petitioner make available information as to his income and expenses and copies of his returns, and indicated that if such information was not made available, third-party inquiries would be necessary. The petitioner brought to such meeting a suitcase which he claimed contained documentary proof of his expenditures for airline tickets and hotels. However, the special agent was not allowed to examine the contents of such suitcase. On August 15, 1962, the special agent telephoned Mr. Swinburne and inquired when the information requested at the April 19th *538 meeting would be made available. Mr. Swinburne stated that his accountant was analyzing data furnished by the petitioner and that Mr. Swinburne would submit the results of such analysis, if satisfactory, after the accountant completed his work. The special agent stated that if such information was not furnished promptly, he would have to resort to third-party inquiries. As of April 17, 1963, Mr. Swinburne reported to the special agent that he had not received either the accountant's report or copies of the petitioner's returns. During 1961 through 1964, neither the petitioner nor Mr. Swinburne furnished any further information to the IRS with respect to the petitioner's income and deductions; nor were copies of the petitioner's returns ever produced. As a result, the IRS resorted to the specific item method of reconstructing the petitioner's income and allowed him deductions based on information received from third parties. Based on his investigation, the Commissioner concluded that for each of the years in issue the petitioner had received unreported income in excess of his allowable deductions. Accordingly, in his notice of deficiency, the Commissioner determined that there *539 was an underpayment of tax for each of the years in issue. In addition, the Commissioner determined that all or a part of the underpayment for each year was due to fraud and that the petitioner had underpaid his estimated tax for each of the years in issue. OPINION The issues for decision are: (1) Whether the petitioner underpaid his Federal income taxes for any of the years in issue; (2) whether any underpayment of tax was due to fraud within the meaning of section 6653(b); and (3) whether the petitioner is liable for additions to tax under section 6654 for underpayment of estimated taxes. We will consider first the issue of whether there were deficiencies in tax. Issue 1. Deficiencies in Tax
The petitioner has stipulated that he received gross income of $ 124,811.72 in 1958, $ 51,973.82 in 1959, $ 93,227.66 in 1960, $ 43,000.00 in 1961, and $ 50,000.00 in 1962. In arriving at the petitioner's taxable income for each of such years, the Commissioner, in his notice of deficiency, allowed the petitioner certain deductions for business expenses. The petitioner claims that he incurred deductible business expenses in excess of the amounts allowed by the Commissioner, and that, as *540 a result, he owes no tax for each of the years in issue.[3] The expenses claimed by the petitioner are as follows: Expenses claimed
by Petitioner
1958
1959
1960
Air travel
$ 21,914.66
$ 17,603.88
$ 15,770.73
Telephone
647.48
550.12
1,448.37
Hotels
10,459.26
1,198.28
7,276.77
Registration expenses
and fees
36,500.00
72,000.00
Travel and
entertainment
989.77
7,257.05
Total
$ 69,521.40
$ 20,342.05
$ 103,752.92
Expenses allowed
by Commissioner
12,100.01
13,457.23
12,232.24
Additional expenses
claimed
$ 57,421.39
$ 6,884.82
$ 91,520.68
Expenses claimed
by Petitioner
1961
1962
Air travel
$ 5,655.44
$ 7,016.42
Telephone
1,528.12
1,430.97
Hotels
12,494.53
9,135.07
Registration expenses
and fees
96,300.00
83,800.00
Travel and
entertainment
880.11
Total
$ 116,858.20
$ 101,382.46
Expenses allowed
by Commissioner
4,061.70
2,028.98
Additional expenses
claimed
$ 112,796.50
$ 99,353.48
The decision as to whether there were deficiencies depends upon whether the petitioner was entitled to the additional deductions *541 claimed by him; he has the burden of proving that he is entitled to such deductions. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, 290 U.S. 111 (1933). Section 162(a) provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Neither party has argued that the petitioner was not carrying on a trade or business during the years in issue; the Commissioner contends that the petitioner was in the trade or business of swindling, while the petitioner contends that he was in the trade or business of representing various companies in their efforts to obtain work in Iran. In either case, the petitioner is entitled to deduct the expenses which he can prove that he incurred in carrying on his trade or business. See Commissioner v. Sullivan, 356 U.S. 27 (1958). The deductions allowed by the Commissioner for air travel, hotels, telephone, and entertainment expenses were based on records received from third parties, principally charges incurred on the Fluor air travel card, and on a box of receipts and cancelled checks provided by the petitioner. In deciding *542 the expenses to be allowed, the agents included most items which showed travel by the petitioner. They excluded travel expenses where the receipts showed travel by the petitioner's relatives or Mr. Swinburne, or where the persons' names were unknown to the agents, or where they did not believe the destinations were business related. The included expenses were allowed without substantiation as to whether such expenses were actually incurred for business rather than personal reasons. The petitioner contends that all the expenses claimed by him are deductible business expenses with the exception of expenses attributable to three trips his wife made with him to Nassau, Bahamas, Paris, France, and Washington, D.C. Moreover, he contends that the amount he claims for entertainment expenses represents less than 10 percent of his actual expenses, since the majority of his entertainment was done overseas and since it was his custom to leave all accumulated bills and receipts in Iran and bring back to the United States only his return trip bills and receipts. However, the petitioner is unable to set forth the names of the persons he claims to have entertained, the nature of the conversations, *543 or otherwise state the business reason for incurring such expenses. The years in issue were prior to the effective date of section 274, which was made applicable to taxable years ending after December 31, 1962. Rev. Act of 1962, Pub. L. 87-834, sec. 4, 76 Stat. 974, 977. Thus, the petitioner need not meet the stringent substantiation requirements of such section, and he asks us to invoke the rule of Cohan v. Commissioner, 39 F. 2d 540 (2d Cir. 1930). However, he has failed to satisfy the conditions for the application of that rule.
The Cohan rule, when applicable, permits a deduction based on estimates where the Court is convinced, from the record, that deductible expenses have in fact been incurred. As stated in Williams v. United States, 245 F. 2d 559, 560 (5th Cir. 1957), Cohan requires that "there be sufficient evidence to satisfy the trier that at least the amount allowed in the estimate was in fact spent or incurred for the stated purpose. Until the trier has that assurance from the record, relief to the taxpayer would be unguided largesse." (Emphasis in original.) It is clear from the record that the petitioner must have incurred some deductible expenses during the years *544 in issue. However, it is equally clear that we have little guidance as to what portion of the petitioner's expenditures for travel, hotels, and telephone were incurred for business rather than personal reasons. The deductions allowed by the Commissioner were based on a presumed business nexus for the allowed expenditures. The Commissioner was highly generous in the deductions he allowed, and generally, the evidence fails to convince us that any additional deductions were allowable. The receipts offered into evidence by the petitioner fail to show a business reason for the petitioner's expenditures. The only corroboration offered by the petitioner was his own self-serving testimony, which we are not required to, and do not, accept. See Armes v. Commissioner, 448 F. 2d 972 (5th Cir. 1971), affg. on this issue a Memorandum Opinion of this Court. With respect to 1961 and 1962, however, we are convinced that for business purposes the petitioner did incur air travel expenses in excess of the amounts allowed by the Commissioner. We find and hold that the following air travel expenses are deductible: Date
Destination
Amount
1/9/61
New York to Chicago to Baltimore
$ 116.93
2/2/61
Newark, N.J., to Baltimore
16.23
3/6/61
Baltimore to New York
16.23
6/18/61
New York to Baltimore
16.23
10/10/61
New York to Chicago to New York
116.93
11/15/61
New York to Chicago to Baltimore
86.85
12/5/61
Houston to Chicago to Baltimore
209.72
6/22/62
Portland, Maine, to Boston to Chicago
114.84
to Newark, N.J.
7/30/62
Newark, N.J. to Baltimore to New York
38.06
*545 The Commissioner allowed the petitioner deductions for air travel of $ 316.00 for 1961 and none for 1962; according to our holding, the petitioner is entitled to the additional amounts of $ 263.12 for 1961 and $ 152.90 for 1962. Our reason for allowing the petitioner a deduction for such additional expenses is that the dates and destinations of such travel correspond with the locations and time period of the petitioner's receipt of income from Procon, Greiner Co., Missouri Valley, and Panama-Williams. In summary, with the exception of the additional air travel expenses for 1961 and 1962, we find and hold that the petitioner has failed to prove that he incurred deductible air travel, hotel, telephone, and entertainment expenses in excess of the amounts allowed by the Commissioner. The petitioner also contends that he is entitled to a deduction for registration fees and legal expenses which he claims to have incurred on behalf of the companies from which he received gross income. The fees which the petitioner claims to have incurred are as follows: Panama-Williams
Missouri
Fluor
Procon
Valley
Iranian registration
to do business in
$ 5,000
$ 5,000
$ 5,000
$ 5,000
Iran
National Iranian
Oil Company
Legal fee
15,000
10,000
5,000
2,000
Registration fee
Iranian Gas Company
Legal fee
15,000
10,000
5,000
4,000
Registration fee
Department of Labor
Legal fee
3,000
3,000
2,000
3,000
Registration fee
1,500
3,000
2,000
3,000
Department of Plan
Organization
Legal fee
5,000
Registration fee
4,000
$ 36,500
$ 31,000
$ 19,000
$ 26,000
(Spent
(Spent
(Spent
(Spent
in
half in
in
in
1958)
1960 and
1961)
1962)
half in
1961)
*546 Winkelman
Greiner
Langenfelder
Brookhart
Co.
Co.
& Son
& Tyo
Iranian registration
to do business in
Iran
$ 5,000
$ 5,000
$ 5,000
$ 5,000
Department of Plan
Organization
Legal fee
5,000
5,000
5,000
5,000
Registration fee
10,000
10,000
7,000
4,000
Purchase of
project layouts
(5 to 10)
30,000
Ministry of Roads
Legal fee
5,000
5,000
5,000
5,000
Registration fee
5,000
3,000
3,000
3,000
Purchase of project
layouts (2 to 4)
8,000
Department of Labor
Legal fee
3,000
3,000
Registration fee
3,000
1,000
Port Authority
Legal fee
5,000
5,000
5,000
Registration fee
3,000
5,000
4,000
Ministry of Housing
& Development
Legal fee
5,000
Registration fee
5,000
Department of Railroads
Legal fee
5,000
2,000
Registration fee
1,000
1,500
$ 44,000
$ 92,000
$ 37,500
$ 26,000
(Spent
(Est. 40%
(Est. 1/3
(Spent
in
spent in
spent in
in
1960)
1961, 40%
1960 and
1962)
spent in
the rest
1962)
in 1961)
The only evidence the petitioner introduced in support of his right to such deductions was his own self-serving testimony. He claims that his lack of documentary evidence is due to the seizure of his business records by the Iranian secret police (SAVAK) in 1967, and that such records were turned over to the American Embassy in Teheran, Iran. He further maintains that officials of the American Embassy either *547 destroyed such records or that officials of the U.S. Government have wrongfully withheld such records despite the petitioner's efforts to obtain such records by an action under the Freedom of Information Act. Thus, the petitioner asks us to accept his testimony and, pursuant to Rule 201, [4] *548 Federal Rules of Evidence, and Rule 146, [5] Tax Court Rules of Practice and Procedure, to take judicial notice of the existence of the necessity of paying such fees and expenses. Rule 201(d), Federal Rules of Evidence, mandates that the party who requests a court to take judicial notice of an adjudicative fact supply such court with the necessary information to do so. The information which the petitioner has furnished us is an excerpt from an official publication of the U.S. Department of Commerce, Industry and Trade Administration, entitled "An Introduction to Contract Procedures in the Near East & North Africa." Such publication is undated and *549 was apparently issued sometime after October 8, 1977. Thus, we do not know if information contained therein is applicable to the years in issue. What is more, although such publication does state the requirement that a company seeking to obtain a contract in Iran register with the Plan and Budget Oranization of Iran, it gives no information as to what fees, if any, are involved in such registration. Hence, even if the requirement of the payment of registration fees and legal expenses were an adjudicative fact within the meaning of Rule 201(b), Federal Rules of Evidence, the petitioner has failed to supply us with the necessary information for Rule 201 to apply to this case. Likewise, the petitioner has failed to bring himself within the applicability of Rule 146, Tax Court Rules of Practice and Procedure.Rule 146 is taken almost verbatim from Rule 44.1, Federal Rules of Civil Procedure. See Note to Rule 146, 60 T.C. 1057, 1137 (1973). Such rule requires that a party who intends to raise an issue concerning the law of a foreign country "shall give notice in his pleadings or other reasonable written notice." However, the petitioner failed to give such notice. See Com'l Ins. Co. of Newark v. Pacific-Peru Const., 558 F. 2d 948, 952 (9th Cir. 1977); *550 Ruff v. St. Paul Mercury Insurance Co., 393 F. 2d 500, 502 (2d Cir. 1968); A. Miller, "Federal Rule 44.1 and the 'Fact' Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine," 65 Mich. L. Rev. 615, 645-649 (1967). Moreover, we are not limited in our consideration of foreign law to the materials submitted by the parties; but where neither party has offered any material with respect to the applicable foreign law, we need not take judicial notice of such law. See Bowman v. Grolsche Bierbrouwerij B.V., 474 F. Supp. 725, 730 (D Conn. 1979); Corporacion Venezolana de Fomento v. Vintero Sales, 452 F. Supp. 1108, 1112 (S.D. N.Y. 1978); Petition of Petrol Shipping Corp., 37 F.R.D. 437, 440 (S.D. N.Y. 1965), affd. 360 F. 2d 103 (2d Cir. 1966), cert. denied 385 U.S. 931 (1966); compare Reese v. Commissioner, 64 T.C. 395 (1975). Even if we were to treat he necessity of paying registration fees and expenses as an adjudicative fact and even if we were to take judicial notice that Iranian law required the payment of such expenses, the petitioner has utterly failed to meet his burden of proving that he paid such expenses. The petitioner testified that such expenses were paid *551 through his father's company, H. Afshar and Company, and that each of the American companies was routinely notified of the incurrence of such expenses. However, not one of the executives of such companies was able to recall having received such notification; nor did any of them have any knowledge that the petitioner performed any services on their behalf. Thus, to accept the petitioner's testimony, it would be necessary to reject the testimony of all the Commissioner's witnesses, persons who had no reason to falsify their testimony. We also find the petitioner's testimony concerning the alleged seizure of his business records to be an unsatisfactory explanation of his failure to produce such records. The alleged seizure did not take place until 1967. Yet, from 1961 through 1967, the petitioner repeatedly was requested by the IRS to bring forth his books and records. During such period, his story was always the same--that his books and records were in Iran and that they would be forthcoming. However, during such period when, according to his testimony, he would have had free access to such books and records, he never produced them. In the light of these circumstances, we are *552 simply not convinced that the alleged books and records ever existed, and accordingly, we hold that the petitioner has failed to carry his burden of proving that he is entitled to any of the deductions for registration fees and legal expenses. Issue 2. Fraud
The next issue for consideration is whether any part of the underpayment of taxes for each of the years in issue was due to fraud with intent to evade tax within the meaning of section 6653(b), which provides in part: (b) Fraud.--If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * The Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment for the year was due to fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Levinson v. United States, 496 F. 2d 651 (3d Cir. 1974), cert. denied 419 U.S. 1040 (1974); Estate of Pittard v. Commissioner, 69 T.C. 391 (1977); Estate of Temple v. Commissioner, 67 T.C. 143 (1976); Imburgia v. Commissioner, 22 T.C. 1002 (1954); Petit v. Commissioner, 10 T.C. 1253 (1948). To establish fraud, *553 the Commissioner must show that the taxpayer intended to evade taxes, which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner, 394 F. 2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner, 26 T.C. 107, 112-113 (1956). The presence of absence of fraud is a factual question to be determined by an examination of the entire record. Mensik v. Commissioner, 328 F. 2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). Since fraud can seldom be established by direct proof of intention, the taxpayer's entire course of conduct can often be relied on to establish circumstantially such fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106. The Commissioner contends that the petitioner realized substantial income from swindling over a 5-year period, that the petitioner was aware of his obligation to file returns and to pay *554 tax on such income, and that, with an intent to evade tax, he failed to do so. The petitioner presents several alternative arguments in response: First, that the funds he received were advances subject to repayment and therefore not income; second, that if such funds were income, they were the income of his father's company, H. Afshar and Company, and not his; and third, that if such funds were received by the petitioner, they were income from embezzlement, not swindling, and therefore the failure to report such income in 1958, 1959, and 1960 was inadvertent and not due to fraud. The petitioner has stipulated that the funds he received from Fluor, Mr. Scruggs, Winkelman Co., JDP, Procon, Langenfelder & Son, Greiner Co., Brookhart & Tyo, Panama-Williams, and Missouri Valley constituted gross income in the year of receipt. However, such stipulation was not entered into until 1976. Such stipulation is binding for purposes of the deficiency, but it does not settle the question of fraud. For us to decide the issue of fraud, we must consider the petitioner's arguments and examine all the circumstances surrounding the receipt of such income to decide whether the Commissioner has shown *555 by clear and convincing evidence that the petitioner intended to evade tax which he knew or believed he owed.
Section 61 provides that gross income means all income from whatever source derived. It has long been established that gross income is broadly defined and that Congress intended "to use the full measure of its taxing power" under the 16th Amendment. Helvering v. Clifford, 309 U.S. 331, 334 (1940). Whether there is an economic benefit accruing to the taxpayer is the crucial factor in determining whether there is gross income. James v. United States, 336 U.S. 213 (1961); Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955); Rutkin v. United States, 343 U.S. 130 (1952). A loan or advance does not constitute income to the borrower, since the temporary economic benefit derived from the use of such funds is offset by the corresponding obligation to repay. United States v. Rochelle, 384 F. 2d 748, 751 (5th Cir. 1967), cert. denied 390 U.S. 946 (1968). However, where a "borrower" obtains funds by fraud or swindling, and where it is apparent that he recognizes no obligation to repay, the receipt of such funds constitutes income. They are income even though his freedom to use such *556 funds may be assailed by someone with better title to them. Rutkin v. United States, supra at 137. As stated by the court in Rochelle: Were we to hold otherwise, confidence men could avoid the tax consequences of their transactions by merely adding a false promise to repay to their other representations. Such a distinction between fraudulently obtained "loans" and fraudulently obtained outright grants is not tenable here. [384 F. 2d at 752.] See also McSpadden v. Commissioner, 50 T.C. 478 489-490 (1968). It is clear from the record that the petitioner had no intention to repay the funds advanced to him and that he had the unrestricted use and benefit of such funds. The petitioner represented himself either as a man of influence with the officials in Iran who controlled the awarding of contracts, or as an envoy of the Iranian government in selecting contractors, or as the probable candidate for the position of Administrator of Public Works in Iran. After initiating his contact, the petitioner asked for an advance to cover the cost of bringing an Iranian negotiating team to the United States, or in the case of Mr. Scruggs, to Helsinki, to discuss the potential contract. Invariably, *557 an unforeseen, but never precisely defined, "problem" developed which necessitated the expenditure of more funds than had been anticipated. Such request for additional funds usually came via a telephone call from Geneva. The funds were advanced, but the negotiating team never arrived or the deal did not go through. In not one situation did the petitioner obtain any business in Iran for the contractor, nor did he bring representatives from Iran, nor did he return any of the funds advanced except for those demanded by Mr. Scruggs. Although the mere failure to repay an advance is not evidence that there never was an intent to repay, the uniformity of his pattern of operations shows beyond a doubt that the funds were obtained under false pretenses. Also, the fact that the petitioner never utilized the funds "advanced" for their stated purpose, and in the case of Fluor, used such funds to settle a potential suit by Mr. Scruggs, clearly demonstrates that he had the unrestricted use and benefit of such funds. See Rutkin v. United States, supra; United States v. Rochelle, supra; Leaf v. Commissioner, 33 T.C. 1093 (1960), affd. per curiam 295 F. 2d 503 (6th Cir. 1961). The petitioner testified *558 that he still considers himself obligated to repay the funds "advanced" to him. Such testimony is simply too improbable for us to place any credence upon it. The transactions involved here occurred 17 to 21 years prior to trial. According to the petitioner's testimony, after his father's death in 1963 or 1964, he succeeded to the presidency of H. Afshar and Company, a large and prosperous corporation.Clearly then, at least until 1967, the petitioner would have had the financial resources to repay some or all of the funds advanced to him; yet, he did not. Having determined that the funds the petitioner received were income, we next consider his argument that such income was not his, but that of his father's company, H. Afshar and Company. The petitioner contends that, during the years in issue, he was in charge of H. Afshar and Company's U.S. operations. The only evidence supporting such contention is the petitioner's testimony. None of the individuals who dealt with him had any knowledge that he was working for anyone other than himself. Under such circumstances, we find the petitioner's testimony unworthy of belief. See Potito v. Commissioner, 534 F. 2d 49 (5th Cir. 1976), *559 affg. per curiam a Memorandum Opinion of this Court, cert. denied 429 U.S. 1039 (1977); Lovell & Hart, Inc. v. Commissioner, 456 F. 2d 145, 148 (6th Cir. 1972), affg. per curiam a Memorandum Opinion of this Court; Ruark v. Commissioner, 449 F. 2d 311, 312 (9th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court; Fleischer v. Commissioner, 403 F. 2d 403, 406 (2d Cir. 1968), affg. a Memorandum Opinion of this Court; Glimco v. Commissioner, 397 F. 2d 537, 540-541 (7th Cir. 1968), affg. a Memorandum Opinion of this Court, cert. denied 393 U.S. 981 (1968). What is more, the petitioner's testimony is contradicted by his claim of deductions for alleged business expenses. He has contended that he is entitled to business deductions for expenses he claims are related to the funds he received. Yet, if the petitioner's relationship with H. Afshar and Company was as he states, any deductions would have been the company's and not the petitioner's. Thus, the petitioner's claim that such deductions were his own is utterly inconsistent with his argument that the income to which such deductions relate did not belong to him. Accordingly, we find and hold that the Commissioner has clearly *560 proven that the income the petitioner received was taxable to him, and not to H. Afshar and Company. The petitioner's next argument is that if the funds received by him were income, such funds were obtained by embezzlement; therefore, he contends that even if he failed to report and pay tax on such income, the Wilcox rule ( Wilcox v. Commissioner, 327 U.S. 404 (1946)) was in effect during 1958 through 1960, and therefore, any underpayment with respect to such income cannot form the basis for the imposition of the fraud penalty for such years. Although the petitioner may have correctly stated the law with respect to embezzled funds, he has improperly characterized the receipt of his illegally gotten gains. In Wilcox, the Supreme Court held that the proceeds of embezzlement did not constitute taxable income to the embezzler, but Wilcox was overruled by James v. United States, 366 U.S. at 221-222. James has been applied retroactively to hold that the proceeds from embezzlement were taxable income (see Geiger's Estate v. Commissioner, 352 F. 2d 221 (8th Cir. 1965), affg. a Memorandum Opinion of this Court, cert. denied 382 U.S. 1012 (1966)), but there is some doubt as to whether James *561 should be applied retroactively to hold that the failure to report such income may alone be the basis for imposing the civil fraud penalty. See Estate of Kahr v. Commissioner, 414 F. 2d 621, 627 (2d Cir. 1969), affg., in part, on this ground 48 T.C. 929 (1967); Adame's Estate v. Commissioner, 320 F. 2d 811 (5th Cir. 1963), revg. on this issue 37 T.C. 807 (1962); McGee v. Commissioner, 61 T.C. 249 (1973), affd. 519 F. 2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). In between Wilcox and James, the Supreme Court decided Rutkin v. United States, supra.Rutkin limited Wilcox to its facts and held that extorted funds did constitute taxable income to the extortionist. Thus, after the Supreme Court's decision in Rutkin, and prior to its decision in James, a taxpayer seeking to avoid the taxation of the income had to show that he acquired his illegal gains through embezzlement, and not through fraud, extortion, false pretenses, or swindling. See Rollinger v. United States, 208 F. 2d 109 (8th Cir. 1953). In Rollinger, at 112, the court quoted with approval 29 C.J.S., Embezzlement, sec. 1, p. 671: "Embezzlement differs from swindling or obtaining money by false pretenses in that *562 in embezzlement the property is fraudulently appropriated by the person to whom it had been intrusted, whereas in swindling the property is wrongfully acquired in the first instance by means of some false pretense or device." See also Akers v. Scofield, 167 F. 2d 718, 719-720 (5th Cir. 1948), cert. denied 335 U.S. 823 (1948); McGee v. Commissioner, supra at 258; Perkins, Criminal Law, ch. 4, sec. 4, pp. 297-298, 306 (2d ed. 1969). Under such definition, it is clear that the petitioner did not acquire the funds he received by embezzlement, but rather by swindling or false pretenses. [6] *563 Hence, during all of the years in issue, the law was settled that the funds the petitioner received constituted income which he was required to report in the year of receipt. See Rutkin v. United States, supra. What is more, even after the James decision, the petitioner did not report the funds received by him from the various contractors.[7] Such decision should have removed any doubt from his mind that such funds were taxable income in the year of receipt. His consistent failure to report such funds, both before and after James was decided, is convincing evidence that the petitioner was not relying on the possibility that such funds were not taxable prior to James. Rather, such failure is evidence that the petitioner was attempting to conceal his receipt of such funds with an intent to evade tax. McGee v. Commissioner, 61 T.C. at 260-261. The mere failure to file tax returns, even over an extended period of time, does not in itself establish liability for additions to tax on account of fraud *564 ( Marsellus v. Commissioner, 544 F. 2d 883, 885 (5th Cir. 1977), affg. a Memorandum Opinion of this Court); but, such failure to file is persuasive circumstantial evidence of fraud and may properly be considered in connection with other facts in determining whether any underpayment of tax is due to fraud. Stoltzfus v. United States, 398 F. 2d at 1005; Beaver v. Commissioner, 55 T.C. 85, 93 (1970). The petitioner testified that he filed returns for each of the years in issue. For the years 1958 through 1960, the petitioner contends that his returns were prepared by Siavoosh Kalaly, the head accountant of H. Afshar and Company. He contends that after he signed such returns, Mr. Kalaly mailed them to the IRS. For the years 1961 and 1962, the petitioner contends that "tentative" returns were prepared by his attorney, Mr. Swinburne, and that Mr. Swinburne filed such returns with the IRS. Based on his exhaustive searches in 1963 and 1964 and again in 1978 and 1979 that disclosed no returns filed by the petitioner for the years in issue, and on inconsistencies in the evidence offered by the petitioner, the Commissioner asks us to conclude that the petitioner did not file a return for *565 any of the years in issue. We agree with the Commissioner. The searches conducted by the Commissioner to determine if there was a record of returns filed by the petitioner were very thorough. [8] *566 Although it is possible that one of the petitioner's returns could have bee lost in the mails or by the IRS, the fact that such searches failed to disclose a filing for 5 consecutive years is convincing evidence that returns were not filed.However, there is strong additional evidence that the petitioner did not file a return for any of the years in issue. In his affidavit, Mr. Kalaly stated that he filed the petitioner's 1958, 1959, and 1960 returns with the "U.S. Treasury Department, New Jersey." He further stated that such returns were filed during the month of February, and the copies of such returns were sent to the petitioner in the United States. The petitioner testified that he could not remember if he signed his 1958 return, but he believed that he signed his 1959 return. Yet, he also testified that during the years in issue he made only one trip to Iran each year in the *567 month of March. At his meeting with the special agent on January 4, 1962, the petitioner stated that copies of his returns were in Iran. From such evidence, it would be necessary for us to believe that Mr. Kalaly prepared the returns in Iran, that the returns with copies thereof were mailed to the petitioner in the United States for his signature, and that the petitioner sent the original returns to Iran for Mr. Kalaly to file them and the copies to be retained there. Such explanation is highly implausible and constitutes additional evidence that the petitioner did not file returns for the years 1958 through 1960. The returns allegedly filed by the petitioner for 1961 and 1962 were "tentative" returns. Such returns, if they were filed, were merely a Form 1040 showing the petitioner's name, his wife's name, a New Jersey address, the names of his dependents, and no information as to his income and deductions. The petitioner now admits that the filing of such tentative returns was inadequate. See Schroeder v. Commissioner, 291 F. 2d 649, 654 (8th Cir. 1961), affg. a Memorandum Opinion of this Court, cert. denied 368 U.S. 985 (1962). However, he contends that he filed his returns *568 in such manner on the advice of Mr. Swinburne. Therefore, he argues that his failure to disclose his income and deductions could not have been with an intent to evade tax. The question of whether there has been good-faith reliance on advice of counsel is a question of fact. United States v. Baldwin, 307 F. 2d 577, 579 (7th Cir. 1962), cert. denied 371 U.S. 947 (1963). In order to justify his reliance on the advice of counsel, it is essential that the taxpayer make a full and honest disclosure of information sufficient for the preparation of a correct return. United States v. Cox, 348 F. 2d 294, 296 (6th Cir. 1965).Also, such reliance must be in good faith and not designed merely to provide a defense. See Ginsburg v. Commissioner, 13 B.T.A. 417, 421 (1928). The reason given by the petitioner for filing tentative returns was that contract negotiations were pending as of the due dates for his 1961 and 1962 returns. He testified that if such contracts were finalized, the funds advanced to him would have been income to him, and not loans. [9] However, the explanation given by Mr. Swinburne is not consistent with that of the petitioner. In his affidavit and in the requests for extension *569 of time to file the petitioner's 1962 return, Mr. Swinburne stated that his reason for filing tentative returns was that the petitioner was not able to produce sufficient records and information to file a completed return, particularly information with respect to the petitioner's deductions. [10] In view of the inconsistency between the explanations given by the petitioner and Mr. Swinburne, we are not convinced that the petitioner adequately informed his counsel, and consequently, the petitioner's failure to file proper returns cannot be justified by his alleged reliance on the advice of his counsel. See United States v. Cox, supra; United States v. McCormick, 67 F. 2d 867, 870-871 (2d Cir. 1933), cert. denied 291 U.S. 662 (1934). The petitioner *570 also testified that in connection with his criminal case for willful failure to file, he delivered copies of his returns for 1958 through 1962 to the district court in Newark, N.J. However, the petitioner did not secure copies of such court's records. He did subpoena the Justice Department's file for such case. Such file would presumably have contained copies of the petitioner's returns, but it only contained an unsigned copy of the petitioner's tentative return for 1962. In summary, the evidence is overwhelming that the petitioner did not file returns for any of the years in issue and that the circumstances surrounding such failure to file strongly and unequivocally indicate an intention to avoid the payment of taxes. See Powell v. Granquist, 252 F. 2d 56, 60-61 (9th Cir. 1958); Schwarzkopf v. Commissioner, 246 F. 2d 731, 734 (3d Cir. 1957), affg. on this issue a Memorandum Opinion of this Court; Estate of Hill v. Commissioner, 59 T.C. 846, 856 (1973); Harper v. Commissioner, 54 T.C. 1121, 1139 (1970). Another important indicium of fraud is the petitioner's evasive, uncooperative, and dilatory conduct during the course of the Commissioner's investigation. The rationale behind *571 this concept is that such conduct tends to indicate an effort to conceal the true facts concerning income. See Powell v. Granquist, supra; Irolla v. United States, 182 Ct. Cl. 775, 781-782, 390 F. 2d 951, 954-955 (1968); Estate of Beck v. Commissioner, 56 T.C. 297, 365 (1971); Stone v. Commissioner, 56 T.C. at 224; Beaver v. Commissioner, 55 T.C. at 93; Vise v. Commissioner, 31 T.C. 220, 226 (1958), affd. 278 F. 2d 642 (6th Cir. 1960); Bennett v. Commissioner, 30 T.C. 114, 122 (1958). The petitioner contends that his failure to cooperate was on the advice of Mr. Swinburne. He contends that inquiries by the special agents of companies from which the petitioner was receiving funds were injuring his relationship with such companies and that an agreement was reached between Mr. Swinburne and the special agent that the petitioner would turn over the records requested in exchange for such agent ceasing any third-party inquiries. He further contends that the special agent breached such agreement and that he was advised by Mr. Swinburne that he should therefore not cooperate with the IRS. Our reading of the record discloses a different story. At the April 19, 1962, meeting between the *572 petitioner, Mr. Swinburne, and the special agent in charge of the investigation of the petitioner, it is possible that some agreement was reached that the special agent would forego the making of third-party contacts if the petitioner turned over the information requested at such meeting, specifically copies of his income tax returns, a list of contracts and details as to advances, and the sources of funds deposited in his bank accounts. However, it is apparent that the requested information was not made available, and therefore, the special agent, frustrated in his attempts to examine the petitioner's returns and records, resorted to third-party inquiries. Although the petitioner may have believed that he had an agreement with the special agent, it is clear that as of April 1963, Mr. Swinburne was aware that no such agreement was recognized by the special agent then in charge of the investigation. After such date, Mr. Swinburne repeatedly indicated that both he and the petitioner were attempting to assemble the petitioner's tax records. Thus, unless Mr. Swinburne lied to the special agent or to his client, after April 1963, the petitioner was aware that no such agreement was in *573 effect. Moreover, the petitioner's alleged efforts to obtain his tax records after such date are inconsistent with his contentions that he was advised not to cooperate with the IRS. In the light of all these circumstances, it is clear that the petitioner's conduct was merely an attempt to forestall the Commissioner's investigation and to mislead and conceal his income. As stated by the Court in McGee v. Commissioner, 61 T.C. at 260: While evidence that a taxpayer was attempting to defraud another in a business transaction may not be direct evidence of fraud with intent to evade tax, see Toleano v. Commissioner, 362 F. 2d 243, 247 (C.A. 5, 1966), the Court is entitled to consider such evidence along with other evidence in determining the intent of the taxpayer in doing certain acts, because it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax. Rogers v. Commissioner, 111 F. 2d 987 (C.A. 6, 1940). The legal relevancy of such evidence is based upon logical principles which go to negate *574 innocent intent. United States v. Bridell, 180 F. Supp. 268 (N.D. Ill. 1960); Pappas v. United States, 216 F. 2d 515 (C.A. 10, 1954). The evidence is overwhelming that by conduct intended to mislead and conceal his income the petitioner intended to evade tax which he knew or believed he owed. Consequently, for each of the years in issue, the Commissioner's assertion of an addition to tax for fraud is sustained. Issue 3.Failure to Make Estimated Tax Payments: Section 6654
The final issue for decision is whether the petitioner is liable for an addition to tax, pursuant to section 6654, due to an underpayment of estimated tax for each of the years in issue. The imposition of this so-called penalty is mandatory, unless the petitioner can bring himself within one of the exceptions of section 6654(d). Mitchell v. Commissioner, 51 T.C. 641, 648 (1969), revd. 430 F. 2d 1 (5th Cir. 1970), revd. 403 U.S. 190 (1971); Estate of Ruben v. Commissioner, 33 T.C. 1071, 1072 (1960). The petitioner has the burden of proof on this issue. Estate of Ruben v. Commissioner, supra.
We have already held that the petitioner is liable for deficiencies for 1958 through 1962. The petitioner's income for *575 each of such years was greatly in excess of the amount which required him to make estimated payments.The petitioner introduced no evidence that one of the exceptions of section 6654(d) applies. Accordingly, the Commissioner's determination on this issue is also sustained. See Reaver v. Commissioner, 42 T.C. 72, 83 (1964).
To reflect the additional business expense deductions allowed the petitioner for 1961 and 1962, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.
2. Afshar v. Procon, Inc., 442 F. Supp. 887↩ (S.D.N.Y. 1977).
3. Although the deductions claimed by the petitioner for 1958 and 1959 are less than his gross income for such years, he contends that there would be no tax liability for such years due to a carryback of his net operating losses from 1960, 1961, and 1962. See sec. 172.↩
4. Rule 201, Federal Rules of Evidence, provides in relevant part: (a) Scope of rule.--This rule governs only judicial notice of adjudicative facts. (b) Kinds of facts.--A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. (c) When discretionary.--A court may take judicial notice, whether requested or not. (d) When mandatory.--A court shall take judicial notice if requested by a party and supplied with the necessary information. (f) Time of taking notice.--Judicial notice may be taken at any stage of the proceeding.
Rule 143(a), Tax Court rules of Practice and Procedure, provides that the rules of evidence applicable in the U.S. District Court for the District of Columbia shall apply to trials before the Tax Court. See also sec. 7453. Thus, Rule 201, Federal Rules of Evidence↩, is applicable to the Tax Court. 5. The petitioner asks that we apply Rule 44.1, Federal Rules of Civil Procedure. The Tax Court Rules of Practice and Procedure, not the Federal Rules of Civil Procedure, are applicable to trials before this Court. Thus, we have assumed that the petitioner seeks for us to apply Rule 146, Tax Court Rules of Practice and Procedure, the equivalent of Rule 44.1, Federal Rules of Civil Procedure↩.
6. Compare sec. 503 (embezzlement) with sec. 532 (false pretenses), Cal. Penal Code (West 1970); compare sec. 207 (embezzlement) with sec. 253 (false pretenses), Ill. Ann. Stat., ch. 38 (Smith-Hurd 1935); compare sec. 129 (embezzlement) with sec. 140 (false pretenses), Md. Crim. Law Code Ann., art. 27 (1957); compare sec. 932 (false pretenses) with sec. 1290 (larceny), N.Y. Penal Law (McKinney 1944); compare sec. 4824 (embezzlement) with sec. 4836 (false pretenses), Pa. Stat. Ann., tit. 18 (Purdon 1945); compare sec. 1534 (embezzlement) with sec. 1545 (swindling), Tex. Penal Code Ann., tit. 17 (Vernon 1953).
7. The petitioner does not argue, nor do we find, that the funds he received during 1958 through 1960 were received under differing circumstances than the funds he received during 1961 and 1962.↩
8. The petitioner introduced into evidence a copy of his 1969 return. Such return was allegedly filed with the Service Center in Memphis, Tenn., the Service Center to which residents of Virginia filed their returns. The Commissioner did not direct a search request to the Memphis Service Center, nor did any of his searches disclose a return filed by the petitioner for 1969. Because of the failure to conduct such search and disclose such return, the petitioner would have us conclude that the Commissioner's searches were inherently defective. We find such argument to be a mere ruse. The district offices and service centers to which the Commissioner's search requests were directed covered the geographic areas where the petitioner should have or might have filed a return. No search was conducted at the Memphis Service Center because the petitioner did not reside in Virginia prior to 1969, and therefore, the Commissioner had no reason to search a Virginia address for the petitioner. What is more, even if the petitioner had used a Virginia address on his returns for 1958 through 1962, such returns should have been filed with the Philadelphia Service Center. The Commissioner's search request directed to such service center failed to disclose a return filed by the petitioner for the years 1952 through 1967.
9. Such testimony is inconsistent with the petitioner's argument that the funds he received were not taxable to him, but rather to H. Afshar and Company. ↩
10. At least for 1962, Mr. Swinburne had to have been aware that the petitioner had received gross income in excess of the amount that required the filing of a return, since in that year he had endorsed checks from Greiner Co. payable to the petitioner or the petitionr's wife in the amount of $ 5,250.↩